

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-1995

# Duquesne Lgt v Westinghouse

Precedential or Non-Precedential:

Docket 95-3027

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Duquesne Lgt v Westinghouse" (1995). *1995 Decisions.* Paper 251.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/251

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5035


NAOMI ORTIZ, on behalf of herself
and all others similarly situated

v.

RENTAL MANAGEMENT, INC.
t/a PRIME TIME RENTAL

NAOMI ORTIZ, on behalf of
herself and the uncertified
class consisting of all
residents of New Jersey who are
or have been parties to
contracts to rent to own
merchandise from Defendant and
have been charged illegal fees
and/or interest since April 13,
1988, Defendant, its agents,
employees, and all related
entities excluded therefrom,

Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 94-01875)


Argued August 25, 1995

BEFORE:  GREENBERG, COWEN, and SAROKIN, <u>Circuit</u> <u>Judges</u>

(Filed:  September 12, 1995)


Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ  08033

Lisa J. Rodriguez (argued)
Lisa Chanow Dykstra
Chimicles, Jacobsen & Tikellis

One Haverford Centre
351 West Lancaster Avenue
Haverford, PA  19041

Attorneys for Appellant


J. Samuel Choate, Jr. (argued)
128 North Pitt Street
Alexandria, VA  22314

Jeffrey Zucker
Abraham Pressman & Bauer
1818 Market Street
35th Floor
Philadelphia, PA  19103

Attorneys for Appellee

OPINION OF THE COURT


GREENBERG, Circuit Judge.

This appeal requires us to address whether rent-to-own agreements which are terminable at any time without additional charges fall under the purview of the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq.  The district court, relying primarily on a Federal Reserve Board regulation, concluded that they do not.  The court therefore granted the lessor's motion to dismiss the federal count of the complaint, declined to exercise jurisdiction over the supplemental state claims, and remanded the case to the Superior Court of New Jersey.  Because we agree with the district court, we will affirm its judgment.


I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY


2

Appellant Naomi Ortiz, the named plaintiff in this putative class action, entered into a rental agreement to lease a sofa and a love seat from appellee Rental Management, Inc. (RMI) in November 1992. The rental agreement specified that Ortiz at her option could make rental payments on any one of four schedules:
  — weekly payments of $28.49;
  — biweekly payments of $56.98;
  — semi-monthly payments of 61.72; or
  — monthly payments of $108.63.

The agreement also required her to pay an initial charge of $113.63 for delivery of the furniture, and established a delinquency charge of $5.00 for late payments. Ortiz generally followed the weekly payment plan, although she exercised her option to make some biweekly payments in the summer and fall of 1993. The rental agreement provided that Ortiz could cancel it at any time and return the furniture without further obligation. It also stated that if she made 78 weekly payments or 18 monthly payments (periods that differ in duration by no more than a couple of days), she would own the sofa and love seat. Thus, the agreement is characterized as a rent-to-own (RTO) agreement.

After making about 70 weekly payments -- eight payments less than the number required to transfer ownership of the property to her -- Ortiz ceased making payments, though according to RMI's representations at oral argument before us, she retains possession of the furniture. Instead, on April 13, 1994, she filed this class action in the Superior Court of New Jersey alleging that in offering the RTO agreement, RMI violated the TILA by failing to comply with certain of its disclosure

3

requirements. In support of her claim Ortiz alleged that the wholesale price of the furniture was $380.00, far less than the total amounts in weekly payments required for her to acquire title to the furniture and far less than the amount she had paid at the time she filed the lawsuit.[1] She characterizes the difference in the two amounts as a finance charge and based on this characterization contends that the RTO agreement is a credit sale within the meaning of the TILA. In addition to the TILA claim, Ortiz asserted causes of action under various New Jersey statutes and common law doctrines.

RMI removed the case to the district court on April 26, 1994, and soon thereafter moved to dismiss Ortiz's TILA claim for failure to state a claim upon which relief could be granted pursuant to Fed. R. Civ. P. 12(b)(6). The district court granted the motion to dismiss in a memorandum opinion dated January 6, 1995. It reasoned that amendments which the Federal Reserve Board promulgated in 1981 to Regulation Z, which it had issued previously to carry out the purposes of the TILA, placed rent-to-own contracts such as that Ortiz signed outside the ambit of the statute, and that these regulations were entitled to deference. Consequently, in the district court's view the TILA simply did not govern the RTO agreement. The court declined to exercise jurisdiction over Ortiz's state law claims, and thus it remanded the remainder of the complaint to the New Jersey Superior Court.

---

[1]The RTO agreement was annexed to the complaint but the $380.00 figure is not mentioned in the complaint. It appears, however, that RMI does not dispute that figure and thus we will accept it on this appeal.

Judgment was entered in the district court on January 11, 1995, and Ortiz filed a timely notice of appeal. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331, 1441, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of a motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss a complaint.

## II. DISCUSSION

The TILA imposes disclosure requirements on persons in the business of extending credit to consumers. In particular, the TILA delineates specific requirements for credit transactions, 15 U.S.C. §§ 1604, 1631, 1632, as well as detailed instructions on how charges and interest rates must be calculated, 15 U.S.C. §§ 1605, 1606. The TILA only applies to "credit sales," however, and therefore this case turns on the statutory and regulatory definition of that term.

> Congress defined that term under the TILA as follows: The term 'credit sale' refers to any sale in which the seller is a creditor. The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract.

15 U.S.C. § 1602(g).

As the district court recognized, courts interpreting this statutory language following the enactment of the TILA split on whether contracts like the one at issue here were covered by the

act.  See op. at 5 (citing cases).  However, the Federal Reserve Board, the agency entrusted by Congress to promulgate interpretive regulations enforcing the TILA, consistently opined in a series of nonbinding advisory letters issued between 1973 and 1977 that rent-to-own contracts are beyond the purview of the act.  See Remco Enters., Inc. v. Houston, 677 P.2d 567, 570-71 (Kan. Ct. App. 1984) (citing "[u]nofficial staff opinions").  Its informal opinions were quite significant, see James P. Nehf, Effective Regulation of Rent-to-own Contracts, 52 Ohio St. L.J. 751, 758, 764 (1991) (hereinafter, Nehf, Rent-to-own Contracts), because rent-to-own contracts were common when Congress enacted the TILA in 1968, and because the Board's interpretive Regulation Z essentially tracked the statutory language.

In 1981, the Board formalized its informal opinion and amended Regulation Z in one important way.  The regulation reads

> Credit sale means a sale in which the seller is a creditor.  The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:
>
> (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and services involved; and
>
> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

Regulation Z, 12 C.F.R. § 226.2(a)(16).  The language added by the amendment is "(unless terminable without penalty at any time by the consumer)."  The amended regulation became effective in April 1982.

6

In the first instance, Ortiz urges us to disregard the Board's interpretation, as codified in amended Regulation Z. This we will not do. Congress explicitly empowered the Federal Reserve Board to promulgate regulations to flesh out the details of the TILA:

> The [Federal Reserve] Board shall prescribe regulations to carry out the purposes of this subchapter. . . . [T]hese regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention thereof, or to facilitate compliance therewith.

15 U.S.C. § 1604(a).[2]

In the presence of such an explicit delegation of congressional authority, we must defer quite broadly to the Board's interstitial regulations. Specifically, in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778 (1984), the Supreme Court directed courts to exercise the highest level of deference to regulatory authorizations such as section 1604(a). Id. at 843-44, 104 S.Ct. at 2782. As we have explained, "when Congress expressly delegates authority to an administrative body to fill in the gaps of a given statute, the regulations 'are given controlling weight unless they arbitrary, capricious, or manifestly contrary to the statute,'" Sacred Heart Medical Center v. Sullivan, 958 F.2d 537,

_____

[2]Congress amended this section in 1994 to exclude certain mortgage transactions from the Board's regulatory powers; the amendment is not relevant to this case.

544 (3d Cir. 1992) (citing Chevron, 467 U.S. at 844, 104 S.Ct. at 2782).

In both of its major TILA cases, the Supreme Court has emphasized the broad powers that Congress delegated to the Board to fill gaps in the statute. When it upheld the Board's power to extend the TILA's coverage to any seller that accepted payments in four or more installments, the Court reviewed the legislative history of the TILA and stated:

> The hearings held by Congress reflect the difficulty of the task it sought to accomplish. Whatever legislation was passed had to deal not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future. To accomplish its desired objective, Congress determined to lay the structure of the Act broadly and to entrust its construction to an agency with the necessary experience and resources to monitor its operation. Section 105 [15 U.S.C. § 1604] delegated to the Federal Reserve Board broad authority to promulgate regulations necessary to render the Act effective.

Mourning v. Family Publications Serv., Inc. 411 U.S. 356, 365, 93 S.Ct. 1652, 1658 (1973). In rejecting the seller's argument that the Board had exceeded its regulatory powers, the Court found that "the language of the [regulatory] enabling provision precludes us from accepting so narrow an interpretation of the Board's power." Id. at 371, 93 S.Ct. 1661.

In a subsequent decision addressing disclosure requirements governing acceleration clauses in debt contracts, the Court again placed great emphasis on Congress' broad grant of regulatory powers: "Because of their complexity and variety, . . . credit transactions defy exhaustive regulation by a single statute. Congress therefore delegated expansive authority to the Federal

8

Reserve Board to elaborate and expand the legal framework governing commerce in credit." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 559-60, 100 S.Ct. 790, 794 (1980) (citing 15 U.S.C. § 1604 and Mourning). The Court declared that "deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z" and held that "[u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive." Id. at 565, 100 S.Ct. at 797.

Ortiz thus faces an extremely high burden -- she must convince us that the Board's regulation is demonstrably irrational. Ortiz has failed to overcome this burden. In the first place, the landscape that existed when the Board amended Regulation Z was far from clear. Indeed, the statutory language does not lend itself easily to a single unchallengeable interpretation. For example, although the statute refers to "credit sales," it provides that certain leases are covered. And although it covers leases that are "contracts to pay as compensation for use a sum substantially equivalent to or in excess of the . . . value of the property," it is unclear whether the language refers to the lessee's rights or obligations. After all, a lessee may have a right to exercise an option to become an owner of the property, but may be obliged only to make rental payments for the time periods he or she actually uses the property. It is clear, then, that there was a gap in the statute.

9

Thus, it is hardly surprising that courts interpreting the TILA prior to the 1981 amendment of Regulation Z reached conflicting conclusions with respect to RTO agreements. In Waldron v. Best T.V. and Stereo Rentals, Inc., 485 F. Supp. 718 (D. Md. 1979), the court declined to say that a lease contract terminable at will fell definitively outside the TILA's purview. Rather, "[d]espite the presence of the termination clauses, the agreement was essentially a contract for the credit sale of the TV set to plaintiff for a sum substantially greater than the cash sale value of the set." Id. at 719. In reaching its decision, the court relied heavily on the fact that "the contract was to remain in force unless . . . the plaintiff exercised her right to terminate the contract and forfeit the equities she had built up in the set by her weekly payments . . . ." Id. In Smith v. ABC Rental Sys. of New Orleans, Inc., 491 F. Supp. 127 (E.D. La. 1978), aff'd, 618 F.2d 397 (6th Cir. 1980), however, the court, interpreting a nearly identical contract, reached precisely the opposite conclusion: Because the agreement was terminable at any time, "plaintiff was never obligated for any sum other than the $16.00 weekly rental for each week he chose to keep the set." Id. at 129. Therefore, "[t]he week-to-week rental is not a sum substantially equivalent to the set's value, and the transaction in question is . . . not a credit sale." Id.

It was against this backdrop that the Board amended Regulation Z to provide that rental agreements "terminable without penalty at any time by the consumer" are not covered by

10

the TILA.  As Nehf has explained the situation before and after the amendment:

> [a]mid all th[is] uncertainty, it was undeniably true that the unpredictability of the situation was inadequate for all concerned.  Thus, the Board . . . revised Regulation Z . . . to settle the issue.  The revised (and current) definition of 'credit sale' . . . should have resolved the debate in favor of the RTO industry because the heart of an RTO contract is its provision for the consumer to return the property at any time without further payment.  Several courts have since held that the regulation does indeed end the discussion.

Nehf, Rent-to-Own Contracts, 52 Ohio St. L. J. at 766.  While Ortiz argues that the Board's interpretation is presumptively unreasonable because it does not have the effect of protecting consumers, we find no authority for the proposition that the Board must decide every conceivable question, even detailed and technical ones, in favor of expanding the scope of the TILA.  Rather, the Board has broad discretion to draw the lines necessary to effectuate the act.  We therefore cannot say that the Board's adoption of one of two plausible interpretations of the gap in the statute is demonstrably irrational.

Ortiz relies on Clark v. Rent-It Corp., 685 F.2d 245 (8th Cir. 1982), cert. denied, 459 U.S. 1225, 103 S.Ct. 1232 (1983), but that case does not help her.  Although it adopted a reading of the statute consistent with her contentions, the contract addressed in that case arose prior to the effective date of the 1981 amendment of Regulation Z.  Thus, the court did not discuss either the amended regulation or the deference due the Board.  As such, Clark is simply one of a number of pre-amendment Regulation

11

Z cases that reached varying results without the benefit of the Board's formal view.

In view of our conclusion that we should defer to the regulation, we next determine whether the contract at issue is "terminable without penalty at any time by the consumer." In this regard, the facts as Ortiz presents them show that if she wanted to terminate the lease, she only had to return the furniture. At that point she would not forfeit a deposit to which she had title or claim, be obliged to pay any additional charges, or be subject to legal action for a recovery of the remaining rental payments. Accordingly, she could terminate the lease without penalty.

Ortiz seeks to avoid this conclusion by contending that with each payment on the lease she developed an equity in the furniture which she would lose on its return which loss she characterizes as a penalty.[3] She finds support for this proposition in an unpublished opinion of the New Jersey Superior Court, <u>Green v. Continental Rentals</u>, No. L 3182-90 (N.J. Super. Ct. Law Div. Mar. 25, 1994).

To adopt Ortiz' argument would be to allow the exception to swallow the rule. If payments made pursuant to a rent-to-own contract are considered "forfeited equity" should the lessee

---

[3]Actually, she contends that the penalties include "a forfeiture of money paid, a forfeiture of equity accrued in the goods, a forfeiture of the goods, and forfeiture of [her] option to purchase the goods." Brief at 20. The first three so-called penalties are the same thing and we do not regard the last as a penalty any more than surrendering possession of the furniture is a penalty.

return the furniture, virtually every rent-to-own contract would fall within the purview of the statute.  That, in turn, would render the distinctions drawn by the Board's Regulation Z essentially meaningless.  As Nehf points out, after examining the history behind Regulation Z in detail:

> If a broader notion of penalty were accepted, the only lease-purchase agreements that would not be deemed credit sales would be those in which equity is never created, i.e., leases in which the remaining price to be paid for obtaining ownership is at all times equal to or greater than the fair market value of the goods. As a practical matter, such an interpretation would require that, to be exempt from TILA, a terminable lease could not transfer ownership unless the dealer charged a final payment approximating the product's then-fair market value.  This view is difficult to justify under the statute because it would render part of the definition of credit sale superfluous.  Both the statute and Regulation Z provide that a lease is a credit sale only if the lessee becomes the owner of the leased goods for nominal consideration at the end of the agreement.  An option purchase price approximating fair market value is generally considered to be more than nominal, and all leases, even long-term obligation leases, containing such options are generally held not to be credit sales.  Thus, an RTO contract with a fair market value purchase option would be exempt from TILA in any event, irrespective of its terminability, and TILA's 'contracts to pay' clause, as well as the Board's 'penalty' language in revised Regulation Z, would add little, if anything, to the definition.

Nehf, Rent-to-Own-Contracts, 52 Ohio St. L.J. at 768 (footnotes omitted).

Additionally, as one court has explained, "[a]lthough the renters may have an economic incentive to make the number of rental payments necessary to acquire ownership of the goods, the agreements provide them the right to terminate at any time."  In re Hanley, 135 B.R. 311, 313 n.1 (C.D. Ill. 1990).  Thus, "[t]he contractual right to terminate precludes a finding that rent-to-

13

own agreements are truly sales with a forfeiture of the property upon termination of payments." Id. We find the Hanley court's analysis persuasive. Regulation Z can have meaning only if the term "penalty" is construed to refer to additional charges imposed upon termination of the agreement. In this case there are no additional charges. Therefore, in spite of our sympathy for Ortiz's predicament, we hold that the equity Ortiz "forfeited" by failing to continue making rental payments is not a penalty for TILA purposes.[4]

### III. CONCLUSION

For the foregoing reasons we will affirm the judgment entered January 11, 1995.

---

[4] Ortiz also argues that her contract is not terminable at any time as it could be terminated only "at the end of a rental cycle." Brief at 8. The contract, however, does provide that the lessee may at her option "at any time terminate this agreement, without further obligation or penalty," by returning the property and making all payments due under the lease to that point. Of course, inasmuch as rent is payable in advance, ordinarily a lessee desiring to terminate a lease would be wise to do so at the end of a rental cycle. Nevertheless, the lease is terminable at any time and the possibility that a lessee will not retain the use of the property for a period for which she had paid rent is no more a penalty than her surrender of her "equity" in the furniture.

14