

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-2003

# Roberts v. Fleet Bank

Precedential or Non-Precedential: Precedential

Docket No. 01-4420P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Roberts v. Fleet Bank" (2003). *2003 Decisions.* Paper 300.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/300

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 27, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4420

DENISE ROBERTS, individually and
for all others similarly situated

v.

FLEET BANK (R.I.), National Association,
A Nationally Chartered Bank; FLEET CREDIT
CARD SERVICES, L.P., A Rhode Island Limited
Partnership

DENISE ROBERTS, on behalf of herself
and all others similarly situated,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Judge: The Honorable John P. Fullam
(D.C. Civ. No. 00-cv-06142)

Argued on September 12, 2002

Before: ALITO, FUENTES and OBERDORFER,*
*Circuit Judges*

(Opinion Filed: August 27, 2003)

*Honorable Louis F. Oberdorfer, Senior District Judge for the District of
Columbia, sitting by designation.

Ira Neil Richards [Argued]
Gary M. Goldstein
Trujillo Rodriguez & Richards
The Penthouse
226 W. Rittenhouse Square
Philadelphia, PA 19103

Roberta D. Liebenberg
Mary L. Russell
Fine Kaplan & Black
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103

Marc H. Edelson
Hoffman & Edelson
45 W. Court Street
Doylestown, PA 18901

*Counsel for Appellant*

Alan S. Kaplinsky
Burt M. Rublin [Argued]
Ballard Spahr Andrews &
 Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

*Counsel for Appellees*

## OPINION OF THE COURT

*FUENTES*, Circuit Judge:

This Truth in Lending Act case concerns a credit card solicitation that Fleet Bank (R.I.), N.A. and Fleet Credit Card Services, L.P. (collectively "Fleet") sent to Appellant, Denise Roberts, encouraging her to open an account with Fleet based on a promise of a "7.99% Fixed" annual percentage rate ("APR"). The solicitation stated that the interest rate was "NOT an introductory rate" and that "[i]t won't go up in just a few short months." The solicitation also stated that "[w]ith an extraordinary 7.99% Fixed APR . . . the Fleet Titanium MasterCard goes beyond *all* expectations." Sometime after Roberts opened her Fleet

account, the bank sent her a letter stating that it was increasing the 7.99% fixed APR to 10.5%. Roberts brought this class action claiming that Fleet violated the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, when it failed to clearly and conspicuously disclose that the fixed-rate APR that it was offering was limited in duration and subject to its asserted contractual right to change the interest rate at any time. The District Court granted summary judgment to Fleet, concluding that the materials Fleet sent to Roberts allowed it to change the rate.

We agree with Roberts that Fleet's solicitation materials could cause a reasonable consumer to be confused about the temporal quality of the offer. We therefore believe that a material question of fact exists as to whether the bank made any misleading statements in the mailings to Roberts and failed to disclose information required under the TILA "clearly and conspicuously." Accordingly, we reverse the entry of summary judgment and remand for further proceedings.

## I.  Background

A.  *Factual*

In May 1999, Roberts received a packet of solicitation materials from Fleet urging her to apply for its new "Titanium MasterCard." The packet included an introductory flyer, a solicitation letter, a "Pre-Qualified . . . Invitation," and an Initial Disclosure Statement ("IDS"). The introductory flyer indicated that the card would have a "7.99% Fixed APR" on both purchases and balance transfers. Under the heading "FINANCIAL ADVANTAGES," the flyer again stated that the fixed APR was 7.99%.

In addition to the flyer, the solicitation letter emphasized that the card would carry a "7.99% Fixed APR." The letter further stated that the "exceptionally low 7.99%" would apply not only to any purchases made with the card but also to any balance transfers from existing credit card accounts to the Titanium account. The letter twice claimed that the 7.99% fixed APR was "NOT an introductory rate," and promised that "[i]t won't go up in just a few short months."

In order to obtain the "Titanium MasterCard," the recipient was required to complete the "Pre-Qualified . . . Invitation" form. The front side of the invitation indicated that the credit card carried a "7.99% Fixed APR on purchases and balance transfers." On the back of the invitation Fleet listed the "TERMS OF PRE-QUALIFIED OFFER" and the "CONSUMER INFORMATION" sections. The first two sentences of the "TERMS OF PRE-QUALIFIED OFFER" stated the following:

> I request a Fleet Titanium MasterCard account upon acceptance of my request by Fleet Bank (RI), National Association in Rhode Island. I agree to the terms of the Cardholder Agreement mailed with my Card, including those which provide that the Cardholder Agreement and my account will be governed by Rhode Island and Federal law and that my Agreement terms (including rates) are subject to change.

The "CONSUMER INFORMATION" section contained the "Schumer Box," the table of basic credit card information required under the TILA, 15 U.S.C. § 1601 *et seq.*, as amended by the Fair Credit and Charge Card Disclosure Act of 1988.[1] The Schumer Box contained a column with the heading "Annual Percentage Rate (APR) for Purchases and Balance Transfers." The box beneath that heading indicated "7.99% APR" was the applicable rate. Inside the Schumer Box, Fleet listed two specific circumstances under which that rate could change: (1) if the prospective cardholder failed to meet any repayment requirements; or (2) upon closure of the account. Fleet listed no other circumstances under which the 7.99% APR could be changed.

The IDS instructed the pre-approved applicant to

---

1. Although the statute contains no reference to a "Schumer Box," the tabular chart required under the TILA has become popularly referred to as the "Schumer Box" in honor of the principal sponsor of the House bill, Congressman, now Senator, Charles Schumer. *See* Joseph W. Gelb & Peter N. Cubita, *Credit Card Application and Solicitation Disclosure Legislation: An Alternative to the Rate Ceiling Approach*, 43 Bus. Law. 1557, 1561 (1988); Cara Schwarzkopf, *Credit-Ability*, Newsday, Mar. 23, 2001.

"[p]lease read this together with the TERMS OF PRE-QUALIFIED OFFER and the CONSUMER INFORMATION enclosed." Under the heading "Rate Information," the IDS indicated that the APR for the Fleet Titanium Card would be 7.99% for any purchases or balance transfers. Like the Schumer Box, the IDS noted two specific circumstances under which Fleet could change the fixed rate: (1) failure of the prospective cardholder to meet any repayment requirements; or (2) closure of the account. Fleet included no other circumstances in the IDS under which it could change the 7.99% APR.

Roberts completed and returned the invitation to Fleet. In June 1999, she received her Fleet Titanium MasterCard, along with the Cardholder Agreement. Section 10 of the Agreement, titled "Annual Percentage Rate," indicated that the APR would be 7.99%. In this section Fleet also reiterated that it reserved the right to change the rate under the circumstances described above. However, in Section 24 of the Cardholder Agreement, titled "Change in Terms," Fleet stated that:

> We have the right to change any of the terms of this Agreement at any time. You will be given notice of a change as required by applicable law. Any change in terms governs your Account as of the effective date, and will, as permitted by law and at our option, apply both to transactions made on or after such date and to any outstanding Account balance.

Fleet later sent Roberts a letter notifying her that Fleet would be increasing the fixed-rate APR on the Titanium MasterCard. In July 2000, thirteen months after Roberts had received her card, Fleet increased the fixed rate APR to 10.5%.

B.  *Procedural*

On December 5, 2000, Roberts filed this class action, asserting a claim pursuant to the TILA and claims under Rhode Island law for violation of the Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et seq.*, breach of contract, and unjust enrichment. Fleet moved to dismiss the TILA claim on February 12, 2001, submitting as exhibits to the motion documents that Fleet

asserted the District Court could consider as incorporated into the Complaint. On June 5, 2001, the District Court, stating that "[s]ince all parties rely on matters outside the pleadings, the motion will be treated as a motion for partial summary judgment under FED. R. CIV. P. 56," granted Fleet's motion based on its conclusion that Fleet had not violated the disclosure requirements of the TILA. *Roberts v. Fleet Bank (R.I.)*, No. 00-6142, 2001 WL 892846, at *1 (E.D. Pa. June 5, 2001). The District Court added that Roberts was "at liberty to pursue the remaining counts of her complaint." *Id.*

On July 3, 2001, Fleet moved for summary judgment on the pendent state law claims. On August 22, 2001, Roberts responded to the motion and moved for relief from the June 5, 2001 Order pursuant to FED. R. CIV. P. 60(b). In a Memorandum and Opinion dated November 20, 2001, the District Court treated Roberts' motion under Rule 60(b) as a motion for reconsideration, and declined to change its decision on the TILA claim. The District Court also entered summary judgment against Roberts on her state law claims. Roberts appealed.

## II. Jurisdiction and Standard of Review

The District Court exercised jurisdiction over Roberts' TILA claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Roberts' state law claims pursuant to 28 U.S.C. § 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over a district court's grant of summary judgment and review the facts in the light most favorable to the party against whom summary judgment was entered. *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000). Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a

genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

## III. Discussion

A. *The Truth in Lending Act*

Congress enacted the TILA in 1969. The stated purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). In 1988, concerned that consumers were still not receiving accurate information about the potential costs of credit cards, Congress strengthened the TILA's protections for credit card consumers through enactment of the Fair Credit and Charge Card Disclosure Act, "a bill to provide for more detailed and uniform disclosure by credit and charge card issuers, at the time of application or solicitation, of information relating to interest rates and other costs which may be incurred by consumers through the use of any credit or charge card." S. Rep. No. 100-259, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3936, 3937.

In particular, Congress determined that consumers were being inundated with credit card solicitations that failed to disclose basic cost information about the cards being promoted. Prior to the passage of the Fair Credit and Charge Card Disclosure Act, the TILA did not require issuers to provide such information until the consumer actually received the card. Congress decided that demanding early disclosure of relevant cost information from credit card companies would enable consumers to shop around for the best cards. *See* S. Rep. No. 100-259, at 2-3 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3936, 3937-38.

Congress delegated the responsibility of "prescrib[ing] regulations to carry out the purposes of" the TILA to the Federal Reserve Board. 15 U.S.C. § 1604(a). In response to this mandate, the Board promulgated "Regulation Z," 12 C.F.R. § 226, and it also published a comprehensive

"Official Staff Interpretation," 12 C.F.R. Pt. 226 Supp. 1. Both of these measures were published in accordance with "the broad powers that Congress delegated to the Board to fill gaps in the statute." *Ortiz v. Rental Management, Inc.*, 65 F.3d 335, 339 (3d Cir. 1995). In light of Congress' explicit delegation of authority, we defer quite broadly to the Board's interpretation. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) (noting that because TILA is a complicated act, such deference is necessary). *See generally Chevron, U.S.A., Inc. v. Natural Res. Def. Council, et al.*, 467 U.S. 837, 844-45 (1984).

The TILA requires a credit card provider to disclose certain information in "direct mail applications and solicitations," including "annual percentage rates." 15 U.S.C. § 1637(c)(1)(A)(i). The Board's regulations also require "[a] credit card issuer" to disclose the applicable "annual percentage rate." 12 C.F.R. § 226.5a(b)(1) (requiring disclosure of "[e]ach periodic rate that may be used to compute the finance charge on an outstanding balance for purchases . . . expressed as an annual percentage rate."). The TILA requires that information described in 15 U.S.C. § 1637(c)(1)(A), such as "annual percentage rates," must be "clearly and conspicuously disclosed" in a "tabular format." 15 U.S.C. § 1632(a) and (c). Likewise, the Board's regulations mandate that disclosures required under 12 C.F.R. § 226.5a(b)(1) through (7) "be provided in a prominent location on or with an application or a solicitation, or other applicable document, and in the form of a table with headings, content, and format substantially similar to any of the applicable tables found in Appendix G." 12 C.F.R. § 226.5a(a)(2). The Board's regulations also dictate that a "creditor shall make the disclosures required by this subpart clearly and conspicuously in writing." 12 C.F.R. § 226.5(a)(1). Hence, both the TILA and Board-promulgated regulations require a credit card issuer to disclose the applicable annual percentage rate clearly and conspicuously in a table, commonly referred to as the Schumer Box.

### 1. *Schumer Box*

Roberts asserts that Fleet failed to clearly and conspicuously inform consumers that the 7.99% APR was

subject to change at any time. The IDS and the Schumer Box included in Fleet's solicitation materials stated only two conditions under which Fleet could raise Roberts' APR: (1) failure of the cardholder to meet any repayment requirement; or (2) upon closure of the account. Roberts argues that, because a reasonable consumer could read this list as exhaustive and conclude that the 7.99% APR could be raised only under those two described circumstances, this disclosure was neither clear nor conspicuous.

Because the purpose of the TILA is to assure meaningful disclosures, "the issuer must not only disclose the required terms, it must do so accurately." *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 390-91 (3d Cir. 2002). "The accuracy demanded excludes not only literal falsities, but also misleading statements." *Id.* (citing *Gennuso v. Commercial Bank & Trust Co.*, 566 F.2d 437, 443 (3d Cir. 1977)). As "the TILA is a remedial consumer protection statute, we have held it 'should be construed liberally in favor of the consumer.'" *Rossman,* 280 F.3d at 390 (quoting *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 502 (3d Cir. 1998)). *See also Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998) ("We have repeatedly stated that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer."); *Fairley v. Turan-Foley Imps., Inc.*, 65 F.3d 475, 482 (5th Cir. 1995) ("The TILA is to be enforced strictly against creditors and construed liberally in favor of consumers . . . .").

Construing the TILA strictly against the creditor and liberally in favor of the consumer, as we must, we believe that the TILA disclosures in this case, read in conjunction with the solicitation materials, present a material issue of fact as to whether Fleet clearly and conspicuously disclosed its right to change the APR. We therefore conclude that the District Court erred in granting summary judgment to Fleet on Roberts' TILA claim.

In the Schumer Box, Fleet stated that the 7.99% APR could change in the event of nonpayment or closure of the account. Fleet listed no other conditions under which the 7.99% APR could change. We believe that it would be just

as reasonable, if not more reasonable, for a consumer to conclude from the information contained in the Schumer Box that the 7.99% APR could be changed only under the two listed circumstances as it would be for a consumer to conclude that Fleet could change the APR at any time. Roberts has raised a genuine issue of material fact as to the adequacy of Fleet's disclosures and should have been permitted to proceed to trial on the matter.

Fleet argues that it adequately disclosed the necessary information in the Schumer Box and that the Board's regulations prevent it from including a "change in terms" provision in the Schumer Box. We rejected a similar argument in *Rossman*. The dispute in *Rossman* arose from solicitation materials Fleet sent to potential customers indicating that its Platinum MasterCard carried no annual fee. 280 F.3d at 387. Despite the fact that Fleet indicated in the Schumer Box that it would not charge an annual fee, Fleet instituted an annual fee within the first year of Rossman's receipt of the credit card. *See id.* at 388-89. Fleet argued to the Court that a clear and conspicuous statement of its authority to change the annual fee at any time was unnecessary because the change-in-terms provision of the agreement is not among the terms that must be disclosed in tabular format under the TILA. *See id.* at 394. In rejecting this argument, the Court stated that the issue was "not Fleet's obligation to disclose the change-in-terms provision, but its obligation to disclose annual fees." *Id.*

Similarly, in this case, the issue is not Fleet's obligation to disclose the change-in-terms provision, but its obligation to disclose the APR. Our inquiry focuses on whether Fleet's disclosures in the Schumer Box provided "an accurate representation of the legal obligation of the parties . . . when the relevant solicitation was mailed." *Id.* at 391. As we explained above, we believe Roberts raised a question of material fact as to whether Fleet clearly and conspicuously provided an accurate representation of the APR.

2. *Solicitation Materials*

Roberts claims that Fleet's representations in the solicitation letter that the APR would be an "extraordinary,"

"low" fixed APR of 7.99% and that the rate was neither "introductory," nor would it rise "in just a few short months" further support her position that Fleet failed to comply with the TILA. Before addressing this argument, we must first decide whether the TILA permits a Court to analyze the solicitation materials, in addition to the information contained in the Schumer Box, in determining whether a reasonable consumer would comprehend the required disclosures.

Fleet does not specifically argue that we are not permitted to consider information outside of the Schumer Box in determining whether a credit card company has complied with the requirements of TILA. Fleet does argue, however, that the "clear and conspicuous" standard only applies to required disclosures in the Initial Disclosure Statement and the Schumer Box. While we agree with the premise of this argument, we reject its broader implications.[2] When Congress decided to require credit card issuers to disclose required terms in a clear and conspicuous manner, we doubt that it intended for us to ignore other statements made by those issuers in their credit card solicitation materials. Because "[t]he purpose of the TILA is to assure 'meaningful' disclosures," we have recognized that "[t]he accuracy demanded excludes not only literal falsities, but also misleading statements." *Rossman*, 280 F.3d at 390 (citations omitted). As detailed above, Congress amended TILA with the Fair Credit and Charge Card Disclosure Act in order to grant consumers better access to information and to allow consumers to more easily compare the terms of various credit cards. Congress created the Schumer Box to assist consumers in accessing such information, not to shield credit card companies from liability for information placed outside of the Schumer Box. As a result, while we recognize that the TILA only applies the "clear and conspicuous" standard to required disclosures, we conclude that the TILA permits us to consider materials outside of

2. When questioned at oral argument about whether the phrase "rates are subject to change" would more clearly and conspicuously disclose the contractual terms than the phrase "won't go up in just a few short months," which appeared in the solicitation letter, counsel for Fleet responded that the solicitation letter is not the TILA disclosure.

the Schumer Box in determining whether the credit issuer disclosed the required information clearly and conspicuously.

With that background established, we agree with Roberts that the claims in the introductory letter that the "fixed 7.99% APR"[3] is "NOT an introductory offer" and "won't go up in just a few short months" could cause a reasonable consumer to be confused about the temporal quality of the offer. Fleet argues that the phrase "my Agreement terms (including rates) are subject to change," which is included in the Terms of Pre-Qualified Offer section of the Invitation, makes clear that the 7.99% APR is not permanent. However, read in conjunction with information contained in the Schumer Box right below it, that statement could lead a consumer to conclude that the rates are subject to change only for the two reasons outlined in the Schumer Box.

In its defense, Fleet relies on Paragraph 24 of the Cardholder Agreement that states "[w]e have the right to change any of the terms of this Agreement at any time." This provision, however, fails to cure any of the TILA defects in the initial mailing. To begin with, Fleet only mails the Cardholder Agreement after a consumer has accepted the invitation. Thus, a consumer will not learn, until after the acceptance of the invitation, that the APR can be changed by Fleet at any time. Indeed, Fleet's practice of mailing the Cardholder Agreement containing important rate change information, after the consumer accepts the card, is contrary to the TILA mandate that credit card solicitations disclose all required information. *See* S. Rep.

---

3. We recognize that a fixed rate is not necessarily permanent. *See* "Shop — The Credit Card You Pick Can Save You Money," http://www.federalreserve.gov/pubs/shop at "Glossary of Credit Terms." ("The interest rate on fixed-rate credit card plans, though not explicitly tied to changes in other interest rates, can also change over time. The card issuer must notify you before the 'fixed' interest rate is changed."). The potential problem in this case is not that Roberts could have concluded that the rate was permanent solely based on the use of the word "fixed." Rather, the concern is that Fleet may have misled potential consumers by indicating that the rate could only change in the instances it specified in the solicitation materials.

No. 100-259, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3936, 3937. Nonetheless, Fleet argues that it is prohibited from including "change in terms" information in the Schumer Box. However, as we previously stated, this argument avoids the central issue in this case, which is whether the APR was adequately disclosed. Additionally, we note that the "right to change" language in Paragraph 24 contradicts the statement in the introductory letter that this APR "won't go up in just a few short months."[4]

In sum, after reading the materials together as a whole, we believe that a question of fact exists as to whether Fleet made any misleading statements in the mailing and failed to disclose information required under the TILA "clearly and conspicuously."

B. *State Law Claims*

1. *Unfair Trade Practices and Consumer Protection Act*

Roberts next claims that the District Court erred in granting Fleet's summary judgment motion with respect to her claim under the Rhode Island Unfair Trade Practices and Consumer Protection Act ("UTPCPA"). *See* R.I. Gen. Laws § 6-13.1-1 *et seq.* Specifically, based on the authority provided by the Office of the Comptroller of the Currency ("OCC"),[5] the District Court concluded that "plaintiff cannot pursue a claim for violation of the UTPCPA" because "this case falls within [the] exemption" of the UTPCPA. *Roberts v. Fleet Bank (R.I.)*, No. 00-6142, 2001 WL 1486226, at *2 (E.D. Pa. Nov. 20, 2001).

The UTPCPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared

---

4. When questioned about this contradictory language at oral argument, counsel for Fleet admitted that "arguably there is an inconsistency." By acknowledging this "arguable" inconsistency in language, Fleet essentially conceded that a reasonable consumer could find the materials to be confusing and misleading.

5. The Office of the Comptroller of the Currency is the primary regulator of national banks pursuant to authority granted by the National Bank Act, 12 U.S.C. §§ 1, *et seq.*

unlawful." R.I. Gen. Laws § 6-13.1-2. The UTPCPA provides for both a public and a private right of action to enforce its provisions. However, the Act specifically states that "[n]othing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States." R.I. Gen. Laws § 6-13.1-4.

The Rhode Island Supreme Court has instructed that, based on the plain meaning of § 6-13.1-4, "the Legislature clearly exempted from the Act all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers." *State v. Piedmont Funding Corp.*, 382 A.2d 819, 822 (R.I. 1978). The Rhode Island Supreme Court has thus upheld the rejection of claims under the UTPCPA where it has found regulation by a state or federal agency. *See Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 432 (R.I. 2001) (affirming grant of summary judgment partially due to the fact that "the Asbestos Act preempts the action" and "[t]he plaintiff is not therefore entitled to a remedy under § 6-13.1-2."); *Doyle v. Chihoski*, 443 A.2d 1243, 1244 (R.I. 1982) (ruling that "[s]ince the real estate brokerage industry is regulated by the Department of Business Regulation, the trial justice quite properly rejected defendant's reliance on the Deceptive Trade Practices Act.").

Our inquiry must then focus on whether the OCC has the authority to regulate Fleet's activity of soliciting prospective card members. Section 5 of the Federal Trade Commission Act ("FTC Act") proscribes "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "The FTC Act prohibits 'unfair methods of competition,' including advertisements containing false or misleading representations or material omissions." *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 226 (3d Cir. 1990). Section 1818(b)(1) of the Financial Institutions Supervisory Act of 1966 authorizes the "appropriate Federal banking agency" to take enforcement actions against national banks for violations of "a law, rule, or regulation." 12 U.S.C. § 1818(b)(1). This Court has recognized the OCC's power to bring cease and desist

proceedings against national banks under Section 1818(b)(1). *See National State Bank v. Long*, 630 F.2d 981, 988 (3d Cir. 1980).

As a result of the OCC's authority to bring enforcement actions against national banks for violations of laws or regulations, the OCC has the power to regulate false and misleading advertising proscribed under Section 5 of the FTC Act. Consequently, the District Court properly granted summary judgment to Fleet on Roberts' UTPCPA claim.

### 2. *Breach of Contract*

Roberts next asserts that the District Court erred in granting summary judgment to Fleet on her breach of contract claim. Roberts alleges that Fleet entered into a contract with her providing a Fleet Titanium MasterCard that carried a 7.99% APR on purchases, and Fleet breached the contract by raising the APR to 10.5%.

After signing and returning the invitation to Fleet, Roberts received her Fleet Titanium MasterCard along with the Cardholder Agreement. Paragraph 2 of the Cardholder Agreement, "Agreement to Terms," states that "your retention of the Card, and/or your use of the Account in any way means you agree to the terms of this Agreement and the provisions of the Card itself." By retaining and using the card, Roberts thus agreed to the terms of the Cardholder Agreement. Fleet argues that the Cardholder Agreement specifically informed cardholders that their rates were subject to change.

Based on ambiguities in the solicitation materials and the Cardholder Agreement, Roberts claims that a reasonable fact finder could conclude that Fleet's interpretation of the Cardholder Agreement is wrong. "[A] court must find that a contract is ambiguous before it can exercise judicial construction of the document. If the court finds that the terms of an agreement are clear and unambiguous, the task of judicial construction is at an end and the agreement must be applied as written." *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994) (citing *Aetna Casualty & Surety Co. v. Graziano*, 587 A.2d 916, 917 (R.I. 1991)). We have already determined that, by retaining and using the

Fleet Titanium MasterCard, Roberts agreed to the terms of the Cardholder Agreement. As a result, the solicitation materials do not factor into our interpretation of the Cardholder Agreement unless we conclude that the document's terms are unclear or ambiguous.

In Paragraph 24 of the Cardholder Agreement, Fleet reserves "the right to change any of the terms of this Agreement at any time." We find nothing ambiguous in this statement and conclude that Fleet clearly had the right to change the APR under the terms of the Cardholder Agreement. The District Court properly granted summary judgment to Fleet on Roberts' claim for breach of contract.

### 3. *Unjust Enrichment*

Finally, Roberts argues that the District Court erred in granting summary judgment to Fleet on her unjust enrichment claim. An unjust enrichment claim cannot be maintained where a contract governs the relationship between the parties. *See Marshall Contractors v. Brown University*, 692 A.2d 665, 669 n.3 (R.I. 1997) ("It is well settled that where there is an express contract between the parties referring to a subject matter, there can be no implied contract arising by implication of law governing the same subject matter.") Because we have determined that the Cardholder Agreement constitutes an unambiguous, written agreement between the parties in this case, Roberts' unjust enrichment claim must fail as a matter of law and the District Court properly granted summary judgment to Fleet on the claim.[6]

---

6. Roberts also argues that the District Court erred in granting summary judgment to Fleet on her state law claims given the early state of discovery. "We review a claim that the district court has prematurely granted summary judgment for abuse of discretion." *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 510 (3d Cir. 1994). The District Court properly granted summary judgment to Fleet on Roberts' state law claims as a matter of law. Any additional facts gleaned in discovery would not have changed the District Court's analysis or its ultimate conclusion. Consequently, we conclude that the District Court did not abuse its discretion by denying additional discovery to Roberts before granting summary judgment to Fleet on the state law claims.

## IV.  Conclusion

Accordingly, for the reasons stated above, we reverse the judgment of the District Court on the TILA claim and affirm the grant of judgment on the state law issues.

A True Copy:
            Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*