[No. A102603. First Dist., Div. Four. Apr. 29, 2004.]

CYNTHIA M. LOPEZ, Plaintiff and Appellant, v.
CHARLES SCHWAB & CO., INC., Defendant and Respondent.

## COUNSEL

The Sturdevant Law Firm, James C. Sturdevant, Karen L. Hindin and Monique Olivier for Plaintiff and Appellant.

Howard Rice Nemerovski Canady Falk & Rabkin, Gilbert R. Serota, Christine Challas; and Garrett R. Wynne for Defendant and Respondent.

OPINION

**RIVERA, J.**—Plaintiff Cynthia M. Lopez appeals the judgment entered in this action after an arbitration award. We conclude the trial court erred in granting defendant Charles Schwab & Co., Inc.'s (Schwab) motion to compel arbitration. Accordingly, we reverse.

## I. BACKGROUND

Schwab is a securities broker, and as part of its business opens and maintains trading accounts for its clients and executes transfers of securities and buy and sell orders. On January 24, 2000, at Schwab's Albuquerque branch, Lopez applied to open an account by filling out two forms. The first was entitled "Open a Schwab Account Today."[1] This application form included a section in which the applicant could select either a "Schwab Account" or a "Schwab One Account." The Schwab One Account had a higher minimum balance and offered features that the Schwab Account did not, such as a daily sweep of uninvested cash balances into a Schwab money fund, checks or a debit card, and automatic margin trading. Lopez checked only the box indicating she wanted a Schwab One Account. The third page of the application stated in bold print: "! Remember to sign the Account Agreement on the next page."

The following page contained the bold-print heading "Agree to Terms." Among those terms was an arbitration provision, which stated: "I agree to settle by arbitration any controversy between myself and Schwab and/or any Schwab officers, directors, employees or agents relating to the Account Agreement, my brokerage account or account transactions, or in any way arising from my relationship with Schwab as provided in Section 17, pages 11–13, of the Brokerage Account Agreement and Section 23, pages 29–31, of the Schwab One Account Agreement. The following disclosures are made pursuant to applicable self-regulatory organization rules: (1) arbitration is final and binding on all parties; (2) the parties are waiving their right to seek remedies in court, including the right to a jury trial; (3) pre-arbitration discovery is generally more limited than and different from court proceedings; (4) the arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or seek modification of rulings by the arbitrators is strictly limited; and (5) the panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry." At the bottom of this form was a box for Schwab use

---

[1] The parties disagree on whether this form is merely an application or both an application and an agreement. For the sake of simplicity, we will refer to the "Open a Schwab Account Today" form as the application.

only, labeled "Approved." This box was signed, apparently by a Schwab representative, and an account number was assigned.

On the same day, Lopez also completed and signed a form headed "Transfer Your Account to Schwab," on which she indicated she wanted Schwab to transfer all of her Intel shares from an account with another financial institution.

As noted above, the application's arbitration provision stated that the applicant agreed to settle controversies by arbitration "as provided in Section 17, pages 11–13, of the Brokerage Account Agreement and Section 23, pages 29–31, of the Schwab One Account Agreement." The referenced section of the Schwab One Account agreement contained similar language agreeing to arbitration, as well as disclosures similar to those in the application. In addition, it provided that the arbitration would be conducted by the rules of the National Association of Securities Dealers (NASD), the New York Stock Exchange, the Pacific Stock Exchange, or the Chicago Board Options Exchange; and that either party could initiate arbitration by filing a written claim with one of those organizations. It also provided that arbitration would be binding, and included provisions that would be effective if the account holder was not a United States resident. The referenced section of the Schwab Account agreement contained similar provisions.

The Schwab One Account agreement included several other provisions relevant to this dispute. It defined the Schwab One Account agreement as "[t]he agreement you make with us and the Bank when you open a Schwab One Account, consisting of the Schwab One Application, this Schwab One Account Agreement and any other written agreements between you and us concerning your Schwab One Account, all as amended from time to time." A section entitled "Provision of Services" stated: "To open a Schwab One® Account, you complete an account application. When we approve your application and subject to credit verification, we will open a Schwab One Account for you and act as your broker to purchase and sell securities for your account and on your instructions." In a section entitled "Approval of Application, Credit Verification and Account Information," the agreement stated: "The Schwab One Account Agreement is effective only after we approve your Schwab One Account Application. We may decline your application for any reason."

In response to Lopez's application, Schwab directed a letter headed "Account Verification" to Lopez on January 24, 2000. The letter began, "Welcome to Schwab"; it included the account number, indicated the account in question was a Schwab One Account, and included account handling instructions.

The following day, however, Schwab sent a letter to Lopez denying her request for a Schwab One Account. The letter stated in pertinent part: "Thank you for your interest in establishing a Schwab One/Schwab One International account. [¶] At this time we are unable to honor your request·for this account and are also unable to maintain a standard brokerage account for you. This decision is based on a credit analysis that included a consumer credit report. . . . [¶] . . . [¶] You will earn interest for one full week after the date of this letter and then your account will be closed and the assets mailed to you."

Lopez stated in a declaration that she went to Schwab's Albuquerque office on January 28, 2000. A broker there told her an account had not been opened for her, and she had not been approved for an account due to her poor credit report. Lopez told the broker she was only interested in a Schwab One Account and that she did not want the transfer of assets to go forward. She had no further contact with Schwab until March 1, 2000.

According to Lopez's declaration, she contacted her broker at another firm, Merrill Lynch, to place a trade of Intel securities on March 1, 2000. She was informed that all of her Intel shares had been transferred to another account on February 24, 2000. She contacted Schwab that day, and spoke with broker Lee Lauderdale. He told her that when he learned her application had been rejected, he reopened a Schwab account by "pulling a few strings"—although not a Schwab One Account—and had transferred her Intel shares from Merrill Lynch to Schwab. He admitted he had acted without Lopez's permission. Lopez demanded that her stock be returned to Merrill Lynch. Lauderdale agreed, but the stock was not returned until after April 1, 2000.[2]

Lopez filed this action on June 26, 2000, alleging causes of action for conversion and intentional infliction of emotional distress. Schwab moved to compel arbitration and to stay proceedings, and the motion was granted on October 5, 2000. On January 28, 2003, the court dismissed the action, noting the matter had been resolved at a binding NASD arbitration that resulted in an award dated April 8, 2002. Judgment for Schwab was entered on April 3, 2003. This timely appeal ensued.

## II. DISCUSSION

■ Lopez contends the trial court erred in granting Schwab's motion to compel arbitration, arguing she never entered into an enforceable contract

---

[2] In its brief on appeal, Schwab did not dispute Lopez's characterization of the transfer of her Intel shares from Merrill Lynch to Schwab, and stated that the extrinsic evidence presented to the trial court was undisputed. Although this is not central to our analysis, we note that at oral argument, Schwab suggested Lopez's description of events, particularly her statement that her broker told her he "pull[ed] a few strings," may have been inaccurate, but admitted the record does not contain any evidence to contradict Lopez's description.

with Schwab. Where there is no factual dispute as to the language of the agreement or conflict in the extrinsic evidence, we determine the meaning of the contract de novo. (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809]; *Valsan Partners Limited Partnership v. Calcor Space Facility, Inc.* (1994) 25 Cal.App.4th 809, 817 [30 Cal.Rptr.2d 785]; *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1127 [211 Cal.Rptr. 62].)

■ Schwab argues we should resolve any ambiguities in the contract in favor of arbitration, pointing out that there is a public policy in favor of arbitration under both federal and California law. (*McManus v. CIBC World Markets Corp.* (2003) 109 Cal.App.4th 76, 85 [134 Cal.Rptr.2d 446], citing *Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 103 S.Ct. 927] (*Moses H. Cone Hospital*) and *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97 [99 Cal.Rptr.2d 745, 6 P.3d 669].)[3] While it is true that under the FAA, " 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration' " (*Rice v. Dean Witter Reynolds, Inc.* (1991) 235 Cal.App.3d 1016, 1023 [1 Cal.Rptr.2d 265], overruled on other grounds in *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 407, quoting *Moses H. Cone Hospital, supra,* at pp. 24–25), that policy does not come into effect until a court has concluded that under state contract law, the parties entered into an agreement to arbitrate. As stated in *Cione v. Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625, 634 [68 Cal.Rptr.2d 167] (*Cione*), " 'The right to arbitration depends upon contract; a petition to compel arbitration is simply a suit in equity seeking specific performance of that contract. [Citations.] There is no public policy favoring arbitration of disputes that the parties have not agreed to arbitrate. [Citation.]' [Citation.] As noted, the FAA does not apply until the existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation and enforcement of contracts generally. [Citations.]" (See also *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 74, fn. 8 [100 Cal.Rptr.2d 683] ["California's public policy favoring alternative dispute resolution does not come into play unless parties have entered an enforceable arbitration agreement"].)

■ With these principles in mind, we consider whether Lopez and Schwab formed a contract that included an agreement to arbitrate the dispute at issue

---

[3] Securities transactions in interstate commerce are governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA). (*Strotz v. Dean Witter Reynolds, Inc.* (1990) 223 Cal.App.3d 208, 212, fn. 3 [272 Cal.Rptr. 680], overruled on other grounds in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 407 [58 Cal.Rptr.2d 875, 926 P.2d 1061].) The briefs do not present the question of whether or not the FAA applies to this case, and we do not decide the issue, relying instead on principles of contract law.

here. The essential elements of a contract are: parties capable of contracting; the parties' consent; a lawful object; and sufficient cause or consideration. (Civ. Code, § 1550.) "An essential element of any contract is the consent of the parties, or mutual assent. (Civ. Code, §§ 1550, subd. 2, 1565, subd. 2.) Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror. [Citation.] ' " 'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " [Citations.]' [Citation.] The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances. [Citation.] The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer. [Citations.]" (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270–271 [109 Cal.Rptr.2d 807, 27 P.3d 702].)

Schwab takes the position that its application form, headed "Open a Schwab Account Today," constituted an offer to the public to submit the application and an agreement by Schwab to consider it. Schwab contends that Lopez accepted the offer by completing and signing the application. But the application does not support this interpretation. The signature page of the application was headed "Agree to Terms." This page began, "I hereby request that [Schwab] open a brokerage account as indicated above in the names listed as account holders on this Schwab Account Application. I agree to read and be bound by the terms of the applicable Account Agreement . . . ." This language, particularly the words, "I hereby request," indicates Lopez did not expect that filling out the application would conclude her bargain with Schwab; rather, it reflects an expectation that the application was a *request* for a bargain or, in other words, an offer to transfer assets to Schwab in exchange for brokerage services.

Schwab argues that the application contained a present agreement to arbitrate. Again, we view the application differently. The arbitration provision stated Lopez will arbitrate controversies with Schwab "as provided in Section 17, pages 11–13, of the Brokerage Account Agreement and Section 23, pages 29–31, of the Schwab One Account Agreement." By its terms, the Schwab One Account agreement was effective *only after Schwab approved the application.* Schwab argues that the reference to the account agreements "serves only to incorporate by reference the specific forums that one uses to institute the arbitration detailed in those Account Agreements." In fact, the referenced sections do much more than establish forums: they describe the scope and nature of the arbitration agreement, make the legally required disclosures, and set forth numerous other provisions governing costs and fees,

choice of law, enforceability, jurisdiction, and notices, to name a few. In our view, the application serves to ensure that the applicant is aware of the arbitration provision contained in the account agreement, and does not provide independent arbitrability of disputes that arise when no contract is formed between the applicant and Schwab.

Schwab contends, however, that a contract was formed based on its agreement to expend resources checking her credit and considering her application. We see no such agreement in the application. The application authorized Schwab "to make inquiries for the purpose of verifying my creditworthiness and the creditworthiness of my spouse if I am married and live in a community property state. Such inquiries may include verifying information I have given in my Account Application, contacting my employer and obtaining credit reports." It did not obligate Schwab to make any such inquiries. In fact, the Schwab One Account agreement provided that Schwab could deny the application for any reason.

Schwab relies on out-of-state and federal cases in the employment context indicating that an employer's agreement to consider an applicant may be consideration for an arbitration provision in an employment application. In *Martindale v. Sandvik, Inc.* (2002) 173 N.J. 76 [800 A.2d 872, 875], for example, the employee had signed an application stating that as a condition of her employment, she agreed to arbitration of claims related to her employment with the defendant. The court concluded that the employer's consideration of plaintiff's application, its extension of an offer, and its subsequent employment of the plaintiff constituted sufficient consideration of the arbitration agreement, and stated: "That agreement is binding, as would be any other contractual term not contrary to public policy contained in a signed employment application *that led, as here, to employment.*" (*Id.* at p. 879, italics added.) Similarly, in *Sheller by Sheller v. Frank's Nursery & Crafts* (N.D.Ill. 1997) 957 F.Supp. 150, 154, the plaintiffs agreed in their employment applications that, *if they were employed*, all disputes would be submitted to arbitration. The defendant subsequently hired the plaintiffs, and the court concluded the arbitration agreements were enforceable. (*Ibid.*)[4] Here, on the other hand, Schwab *rejected* Lopez's application.

Defendant draws our attention to only one case in which a prospective employee who was *not* hired was held bound by an arbitration provision in an

---

[4] Schwab also draws our attention to two cases in which an employment application containing an at-will provision was found to bind the employee. (*Hoy v. Sears, Roebuck & Co.* (N.D.Cal. 1994) 861 F.Supp. 881, 885 (*Hoy*); *Jenkins v. Eastern Capital Corp.* (N.D.Cal. 1994) 846 F.Supp. 864, 869–872 (*Jenkins*), vacated on other grounds in 69 F.3d 544.) As was the case in *Martindale* and *Sheller*, the employees in both *Hoy* and *Jenkins* were actually hired. (See *Hoy, supra,* at p. 884; *Jenkins, supra,* at p. 866.)

employment application; but that case contains crucial differences from this one. The plaintiff in *Johnson v. Circuit City Stores* (4th Cir. 1998) 148 F.3d 373 applied for a job at Circuit City. The application contained a "Dispute Resolution Agreement," which stated in part: "This agreement requires you to arbitrate any legal dispute related to your application for employment or employment with Circuit City. Circuit City will not consider your application unless this agreement is signed. . . . [¶] . . . [¶] . . . I recognize that if I sign the Agreement and do not withdraw within three days of signing I will be required to arbitrate any and all employment-related claims I may have against Circuit City, whether or not I become employed by Circuit City. [¶] This Agreement will be enforceable throughout the application process, my employment, and thereafter with respect to any claims arising from or relating to my application or candidacy for employment, . . . [¶] . . . [¶] **STOP!** [¶] *IF YOU HAVE **NOT** SIGNED THE AGREEMENT* . . . . [¶] If you have decided **not** to agree to the terms of the preceding DISPUTE RESOLUTION AGREEMENT then you do not need to complete the balance of this application. We appreciate your interest in the company." (*Id.* at pp. 374–375.) The language of this application indicated unambiguously that the dispute resolution agreement was binding on the applicant throughout the application process, whether or not she was hired, and that Circuit City would not consider her application unless she agreed to arbitration of application-related disputes. Here, in contrast, the arbitration provision in the application was limited to disputes related to the account agreement, the account, or the applicant's relationship with Schwab. It does not refer to disputes arising out of the application, and does not indicate it is binding even if the application is rejected.

As a fallback, Schwab contends that even if the arbitration provision was not effective unless an account was opened, Schwab did in fact open an account for Lopez. As evidence, Schwab points to Lopez's application. On the bottom of the first page of the application is a section for Schwab use only. One box in this section is labeled "Approved," and a Schwab representative signed this box. An account number was also assigned. The "Welcome to Schwab" letter dated January 24, 2000, also contains this account number. Finally, the January 25, 2000, letter telling Lopez that Schwab could not honor her request for an account indicated she would earn interest for a week and that her account would then be closed.

The problem with Schwab's position is that Lopez did not apply for the number of an unfunded account—she applied for an account that would include brokerage services. Schwab unequivocally declined to provide those services when it informed Lopez on January 25, 2000, the day after she applied for an account: "At this time we are unable to honor your request for this [Schwab One] account and are also unable to maintain a standard brokerage account for you." It is undisputed that Schwab did not fund the

Schwab One Account Lopez requested, that it never provided the services included in a Schwab One Account, and that it did not transfer assets into any Schwab account in Lopez's name until approximately a month after it denied her request for a Schwab One Account. The Schwab One Account agreement provided that an account would be opened "subject to credit verification." Schwab then refused to enter into a brokerage agreement with Lopez when it sent the January 25, 2000, letter indicating it could not honor her request for an account due to a poor credit report. Schwab could not later unilaterally rescind that rejection. (See *Beverly Way Associates v. Barham* (1990) 226 Cal.App.3d 49, 55 [276 Cal.Rptr. 240] ["[i]t is hornbook law that an unequivocal rejection by an offeree, communicated to the offeror, terminates the offer; even if the offeror does no further act, the offeree cannot later purport to accept the offer and thereby create enforceable contractual rights against the offeror"].)

■ Thus, we conclude the parties did not enter into a contractual relationship, or indeed, any other kind of relationship. In the absence of such a relationship, we must necessarily reject Schwab's argument that the claims fall within the scope of the arbitration provision. First, as noted above, no obligation to arbitrate exists unless the parties have entered into a contract to arbitrate. (*Cione, supra,* 58 Cal.App.4th at p. 634.) Second, the arbitration provision applies to controversies "in any way arising from my [the applicant's] relationship with Schwab as provided in [the account agreements]." Here, we see no relationship to serve as the basis for the obligation to arbitrate. The cases Schwab cites to argue that this dispute is within the scope of the arbitration provision all presuppose an enforceable agreement to arbitrate, something that does not exist here. (See, e.g., *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1314–1316 [231 Cal.Rptr. 315] [arbitration provision in condominium purchase agreement applied to tort claims]; *Pacific Inv. Co. v. Townsend* (1976) 58 Cal.App.3d 1, 9–10 [129 Cal.Rptr. 489] [bound parties participated in limited partnership agreement]; *Bos Material Handling, Inc. v. Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 104–106 [186 Cal.Rptr. 740] [arbitration provision in dealer agreement applied to tort claims]; *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1005 [119 Cal.Rptr. 130] [arbitration clause applied to "disputes arising out of transactions based upon the client-broker relationship which the [customer agreement] established"]; *Lewsadder v. Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 257–259 [111 Cal.Rptr. 405] [agreement to arbitrate any controversy arising out of employment broad enough to include tort liability].) Furthermore, "[c]ontract formation is governed by objective manifestations, not subjective intent of any individual involved. [Citations.] The test is 'what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.]" (*Roth v. Malson* (1998) 67 Cal.App.4th 552, 557 [79 Cal.Rptr.2d 226].) Here, even if Schwab

briefly opened an account for Lopez, her application was immediately rejected and the account she applied for was never funded. A reasonable person standing in Lopez's shoes would not have understood any relationship, contractual or otherwise, was formed with Schwab.

## III. DISPOSITION

The judgment is reversed. The matter is remanded to the superior court for further proceedings consistent with this opinion.

Kay, P. J., and Reardon, J., concurred.