**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAQUEL RUBIO, on behalf of
herself and all others similarly
situated,
   *Plaintiff-Appellant,*

v.

CAPITAL ONE BANK,
   *Defendant-Appellee.*

No. 08-56544

D.C. No.
2:07-cv-06766-
ABC-CW

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
February 3, 2010—Pasadena, California

Filed July 21, 2010

Before: Betty B. Fletcher, Harry Pregerson, and
Susan P. Graber, Circuit Judges.

Opinion by Judge B. Fletcher;
Partial Concurrence and Partial Dissent by Judge Graber

10385

## COUNSEL

Behram V. Parekh (argued) and Joshua A. Fields, Kirtland & Packard LLP, El Segundo, California, for the plaintiff-appellant.

James F. McCabe (argued), Nancy R. Thomas, and Michelle N. Comeau, Morrison & Foerster LLP, San Francisco, California, for the defendant-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

This appeal arises from a direct-mail credit card solicitation that Plaintiff Raquel Rubio received from Defendant Capital One Bank. The solicitation disclosed a "fixed" annual percentage rate of 6.99% on purchases and balance transfers and named three conditions under which that rate could increase. About three and a half years after Rubio applied for and received Capital One's credit card, the interest rate on purchases and balance transfers increased to 15.9%, even though none of the three triggering conditions occurred. Rubio filed suit, alleging violations of the Truth in Lending Act (TILA), the California Unfair Competition Law (UCL), and a breach of contract. The district court dismissed each of these claims under Federal Rule of Civil Procedure 12(b)(6), and Rubio appealed. We reverse in part, affirm in part, and remand.

I

Rubio's First Amended Complaint alleged that in or about February 2004, she received a credit card solicitation in the mail from Capital One, informing Rubio in an opening letter that she had "been pre-selected . . . for a Capital One Platinum MasterCard featuring a low 6.99% fixed APR on balance

transfers and purchases." In the solicitation's so-called "Schumer Box," a table required by federal law, the credit card's APR for purchases was described as a "fixed rate of **6.99%**," with the words in ten-point type and the number printed in large, bold type. Next to the Schumer Box's prominent heading, "**ANNUAL PERCENTAGE RATE** (APR) for purchases," was an asterisk linked to a paragraph printed just below the Schumer Box. That paragraph stated in ten-point type:

> All your Annual Percentage Rates (APRs) are subject to increase if any of the following conditions ("Conditions") occur: (i) you fail to make a payment to us when due; (ii) your account is overlimit; (iii) or your payment is returned for any reason. All APRs will change with the beginning of the billing period after the period in which the condition occurred. The first time any of the Conditions occur [sic], your purchase and special transfer APRs (if applicable) may be increased to a rate of 12.9% **ANNUAL PERCENTAGE RATE** (0.03534% daily periodic rate). If any of the Conditions occur [sic] twice within any 6-month period, all of your APRs may be increased to a rate of 25.9% **ANNUAL PERCENTAGE RATE** (0.07096% daily periodic rate).

Outside the Schumer Box, but farther down on the same page, there was a heading that read "Terms of Offer." Under that heading, printed in eight-point type, the solicitation provided, as part of the terms: "I will receive the Capital One Customer Agreement and am bound by its terms and future revisions thereof. My Agreement terms (for example, rates and fees) are subject to change."

Rubio applied for the Capital One MasterCard, and received it, along with a Cardholder Agreement, in March 2004. In the Agreement, Capital One reserved the right to "amend or change any part of your Agreement, including

periodic rates and other charges, or add or remove requirements . . . at any time."

According to the First Amended Complaint, the Capital One MasterCard provided Rubio with a 6.99% APR on all balance transfers and purchases from March 2004 to August 2007. Rubio never submitted a late payment, exceeded her credit limit, or had her payment returned. On August 3, 2007, however, Rubio received written notification from Capital One that her APR of 6.99% would increase to 15.9%. Rubio could avoid the increase only by closing her credit card account and paying off the balance on the card by September 11, 2007. Neither of Rubio's two Complaints alleges whether Rubio chose to retain or to close her account.

Rubio's First Amended Complaint included claims for breach of contract and violation of the UCL, and attached the Capital One MasterCard solicitation as an exhibit. After briefing, the district court dismissed the breach of contract claim.

Rubio then filed a Second Amended Complaint that made very slight changes in factual allegations and added a TILA claim to the existing UCL claim. Like the First Amended Complaint, it attached Capital One's solicitation as an exhibit. Capital One moved to dismiss Rubio's TILA and UCL claims, and the district court granted the motion.

In reviewing de novo the district court's Rule 12(b)(6) dismissal, we, like the district court, consider the credit card solicitation, *see Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995), as well as the Cardholder Agreement, which Capital One submitted but "whose contents are alleged in [the] complaint and whose authenticity no party questions," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## II

### A

[1] Direct-mail credit card solicitations are among the credit disclosures that TILA regulates. TILA requires that all such solicitations disclose, among other information, "[e]ach annual percentage rate applicable to extensions of credit under" the credit card agreement. 15 U.S.C. § 1637(c)(1)(A)(i)(I) (2006). This APR disclosure must be made "clearly and conspicuously," *id.* § 1632(a), and "in the form of a table," *id.* § 1632(c)(2)(A). This table is popularly called the "Schumer Box."

[2] TILA also delegates to the Federal Reserve Board of Governors the duty to implement TILA's disclosure requirements. *Id.* § 1604(a). Under that delegation, the Board has promulgated "Regulation Z," 12 C.F.R. pt. 226 (2009), to which provisions we defer unless "demonstrably irrational." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980). To implement TILA's mandate that a Schumer Box disclose credit card APRs, Regulation Z requires a Schumer Box to disclose "[e]ach periodic rate that may be used to compute the finance charge on an outstanding balance . . . , expressed as an annual percentage rate." 12 C.F.R. § 226.5a(b)(1). Regulation Z provides that this APR disclosure, like other credit-card disclosures, must "reflect the terms of the legal obligation between" creditor and consumer. *Id.* § 226.5(c).

In applying TILA and its implementing regulations, we "require absolute compliance by creditors," *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009), and "[e]ven technical or minor violations of the TILA impose liability on the creditor," *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989).

B

In her only unwaived TILA claim, Rubio contends that the Schumer Box in Capital One's solicitation misleadingly disclosed the APRs that could be charged under the Cardholder Agreement. According to Rubio, by describing the APR as "fixed" at 6.99% and listing only three conditions under which the APR could be changed, the Schumer Box misled her into believing that 6.99% rate could increase only if one of the three specified events occurred. In doing so, Rubio argues, Capital One's disclosure did not accurately reflect the terms of the Cardholder Agreement, which reserved the right to change the 6.99% rate for any reason at all.

1

Capital One first argues that its disclosure was literally true, because the 6.99% rate could change under any of the three events in the paragraph linked by asterisk to the Schumer Box. It relies on our decision in *Hauk*, which it interprets to reject the notion "that TILA prohibits 'not only literal falsities, but also misleading statements.' " 552 F.3d at 1121 (quoting *Rossman v. Fleet Bank (R.I.) N.A.*, 280 F.3d 384, 391 (3d Cir. 2002)). We disagree with this reading of *Hauk*.

By parting ways from the "Third Circuit's expansive reading of Regulation Z," *id.*, *Hauk* did not condone misleading disclosures. It simply rejected the argument that TILA liability could be based on disclosures that were misleading about anything at all — what it called " 'misleading' in the abstract." *Id.* It did not hold that a creditor was allowed to mislead consumers about information that TILA specifically requires be disclosed. *Hauk* held that a creditor does not violate TILA merely by offering a promotional APR to a consumer who the creditor knows is ineligible for the promotional APR, as long as the conditions for imposing the higher nonpromotional APR are properly disclosed. An undeclared intent to impose the higher APR is not included in the

information TILA and Regulation Z require to be disclosed. *See id.* at 1120-22.

**[3]** By contrast, TILA and Regulation Z do require a Schumer Box to disclose credit card APRs. 15 U.S.C. § 1637(c)(1)(A)(i)(I); 12 C.F.R. § 226.5a(b)(1). This disclosure must be clear and conspicuous, 15 U.S.C. § 1632(a); 12 C.F.R. § 226.5(a)(1), which, for purposes of credit card solicitations, is defined in the official staff commentary to Regulation Z as "in a reasonably understandable form and readily noticeable to the consumer." 12 C.F.R. pt. 226 supp. I, para. 5a(a)(2), cmt. 1; *see also Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 887 & n.4 (9th Cir. 2009) (noting that the official staff commentary is owed deference). Thus, Regulation Z prohibits a Schumer Box from making "misleading" APR disclosures, where "misleading" means a disclosure that a reasonable consumer will either not understand or not readily notice. *See Barrer*, 566 F.3d at 892 (adopting "reasonable cardholder" standard). Put differently, an APR disclosure that is not "clear and conspicuous" is *ipso facto* "misleading."

2

The Schumer Box and the paragraph linked to it by an asterisk described the APR as "fixed" and listed only three events under which the APR could increase. We conclude that Capital One cannot show that, as a matter of law, this disclosure is clear and conspicuous.

a

Although clarity and conspicuousness is a question of law, *see Barrer*, 566 F.3d at 892; *Rossman*, 280 F.3d at 395, empirical evidence is helpful in determining what a reasonable consumer will understand and readily notice. Fortunately, evidence on how a reasonable consumer will understand the term "fixed rate" is available from the Federal Reserve Board of Governors, the very agency tasked with

implementing TILA. The Board has relied on that evidence in promulgating a new regulation that generally prohibits creditors from using the term "fixed." *See United States v. Woods*, 335 F.3d 993, 1001 (9th Cir. 2003) (noting that under 44 U.S.C. § 1507, the Federal Register must be judicially noticed). Where such persuasive and directly relevant evidence is available, armchair empiricism is comparatively unhelpful in determining how a reasonable consumer will read a solicitation.

In 2006, the Board retained a research firm to conduct consumer testing and design improved credit card disclosures based on the results of the testing. *See* Macro Int'l Inc., *Design and Testing of Effective Truth in Lending Disclosures* 1 (2007), *available at* http://www.federalreserve.gov/dcca/regulationz/20070523/ Execsummary.pdf. The firm prepared model credit card disclosures and conducted several rounds of interviews of credit cardholders. Those recruited to participate in the study were intended to represent the full range of demographic characteristics and financial experience in the cardholding public. *Id.* at 4, 17; *see also id.* app. A.

In the early rounds of interviews, the study found that "participants frequently assume that a rate that is labeled 'fixed' cannot be changed for any reason." *Id.* at 33; *see also id.* at 10 ("When asked to define what a 'fixed' rate was, most participants said that it was a rate that would not change."); *id.* at 30 ("When asked what it meant if a rate was labeled 'fixed,' most participants responded that these rates would not change for any reason."). So pervasive was this assumption that the term "fixed" was "removed from models in later rounds." *Id.* at 33.

**[4]** Based on this research as well as later research by the same firm, the Federal Reserve Board promulgated revisions to Regulation Z that became effective July 1, 2010. *See* Truth in Lending, 74 Fed. Reg. 5244, 5246-48 (Jan. 29, 2009).

Based on the research, the revisions specify that in the Schumer Box's APR disclosure,

> the term *fixed*, or a similar term, may not be used to describe [the annual percentage] rate unless the creditor also specifies a time period that the rate will be fixed and the rate will not increase during that period, or if no such time period is provided, the rate will not increase while the plan is open.

*Id.* at 5401 (to be codified at 12 C.F.R. § 226.5(a)(2)(iii)). Under this regulation, a creditor may do what Capital One did — describe an APR as "fixed," without specifying a period during which the APR will remain the same — only if the rate is unchangeable for the life of the card. In explaining the regulation, the Board categorized the term "fixed" as "[m]isleading" and stated that it had "found through consumer testing . . . that consumers generally believe a 'fixed' rate does not change . . . . [A]lthough creditors often use the term 'fixed' to describe an APR that is not tied to an index, consumers do not understand the term in this manner."[1] *Id.* at 5372-73 (cited by *id.* at 5272).

**[5]** The new regulation did not become effective until after the events giving rise to this litigation, and thus does not bind us. The form of Regulation Z that governs this case, however, does prohibit disclosures that a reasonable consumer will not understand. 12 C.F.R. pt. 226 supp. I, para. 5a(a)(2), cmt. 1. The new regulation was adopted because the agency that

---

[1]In explaining why its new regulation generally prohibits the word "fixed" in a Schumer Box, the Board refers the reader to its "decision with respect to use of the term 'fixed' . . . in an advertisement." 74 Fed. Reg. at 5272. That decision restricts the use of "fixed" in an advertisement, classifying it as a "misleading term." *See id.* at 5372.

The "index" the Board refers to in its new regulation is a publicly available measure of the cost of funds (for example, the federal funds rate). *See Consumers Union of U.S., Inc. v. Fed. Reserve Bd.*, 938 F.2d 266, 267-68 (D.C. Cir. 1991).

implements TILA, relying on empirical evidence, concluded that describing an APR as "fixed" is misleading to reasonable consumers. What was misleading in 2006 and 2007, when the consumer studies were conducted, was also misleading in 2004, when Rubio received Capital One's solicitation. The new regulation and the empirical studies it relies on are therefore relevant and informative for this case. For "even where not binding," an agency's interpretation of a statute "certainly may influence courts facing questions the agenc[y] ha[s] already answered." *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 941 (9th Cir. 2008) (citation and quotation marks omitted).

**[6]** Here, the Board has concluded that "fixed" is "generally" interpreted to mean that the rate will not be changed and that the creditor has not reserved the right to change it at a later date. 74 Fed. Reg. at 5373. We need not go so far as to decide how "fixed" is *generally* interpreted. But the Board's conclusion and the study on which it relies certainly persuade us that "fixed" can *reasonably* be interpreted to mean "unchangeable." For that reason, it is not "clear and conspicuous" to describe an APR as "fixed" when the creditor has reserved the right to change the APR for any reason.

Our decision does not make the Board's new regulation retroactive. The Board promulgated its new regulation because, after surveying consumers, it concluded "fixed" was misleading. That is why the new regulation is relevant and helpful: TILA has *always* prohibited misleading APR disclosures. Our holding is simply a concrete application of that prohibition.

It is argued that this appeal should be remanded for factual development because "fixed" can also reasonably be interpreted to mean "not tied to an index." *See* Concurrence and Dissent at 10409-10. But it is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicu-

ous. *See, e.g.*, *Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803, 808 (7th Cir. 2001). Furthermore, because TILA is liberally construed in favor of the consumer and strictly enforced against the creditor, *Jackson*, 890 F.2d at 120, any misleading ambiguity — any disclosure that a reasonable person could read to mean something that is not accurate — "should be resolved in favor of the consumer." *Rossman*, 280 F.3d at 394.

As a final argument that the term "fixed" cannot be misleading, Capital One also relies on the official staff commentary to Regulation Z, which appears to use "fixed" to mean "not tied to an index" rather than "unchangeable." *See* 12 C.F.R. pt. 226 supp. I, para. 5a(b)(1), cmt. 5. We find this contention unpersuasive. The staff commentary to Regulation Z is intended to guide regulated firms and the courts. *See id.* pt. 226 supp. I, intro. cmt. 1. There is nothing in the staff commentary to indicate that its *internal* use of "variable" and "fixed" defines how a reasonable consumer would interpret the words. As the Board has concluded, the best evidence on that question comes from the consumer studies indicating that many reasonable consumers do interpret the term "fixed" as "unchangeable."

b

**[7]** Capital One, however, argues that it cleared up any misunderstanding the term "fixed" may have produced by explicitly listing three conditions under which the APR could change and by adding the statement, "[m]y Agreement terms (for example, rates and fees) are subject to change." We do not agree that this statement made Capital One's disclosure clear and conspicuous as a matter of law.

In the minds of a significant number of consumers, the term "fixed" means "unchangeable." When reading Capital One's Schumer Box against that meaning, reasonable consumers could conclude that the APR was "unchangeable" except for

the three exceptions. They could conclude that Capital One explicitly mentioned the three conditions *precisely because* they were the only reasons that the APR could change. Our analysis on this point comports with the Third Circuit's decision in *Roberts v. Fleet Bank (R.I.), N.A.*, 342 F.3d 260, 266-67 (3d Cir. 2003).

[8] Unlike the three triggering conditions, the statement, "[m]y Agreement terms (for example, rates and fees) are subject to change," was placed outside the Schumer Box and was not linked to it by asterisk. We assume for the sake of argument that in deciding whether a Schumer Box disclosure was clear and conspicuous, we can take into account statements outside the Schumer Box and not linked to it by an asterisk.[2] Even under this assumption, Capital One's argument fails. There was nothing in the statement, "[m]y Agreement terms . . . are subject to change," to indicate that the APR was "subject to change" for reasons *other* than the three reasons the Schumer Box discloses. A reasonable consumer, having concluded from reading the Schumer Box that the APR could change only for the three reasons expressly enumerated, could have interpreted the outside-the-Box statement to mean that the APR was "subject to change" exclusively for those three reasons. In so holding, we again follow the Third Circuit. *Roberts*, 342 F.3d at 268.

[9] At issue in this case is not Capital One's "obligation to disclose the change-in-terms provision, but its obligation to disclose the APR" clearly and conspicuously. *Id.* at 267. Rubio has stated a TILA claim not because Capital One failed

---

[2]TILA and Regulation Z do not merely require that a solicitation disclose each APR that may be used to compute a credit card's finance charge. *See* 15 U.S.C. § 1637(c)(1)(A)(i); 12 C.F.R. § 226.5a(b)(1). They also require that this disclosure be "in the form of a table," that is, disclosed by means of the Schumer Box. 15 U.S.C. § 1632(c)(2)(A); 12 C.F.R. § 226.5a(a)(2)(i). Allowing disclosures made outside the Box to cure a Schumer Box's unclear or inconspicuous APR disclosure would seem to allow creditors to evade the tabular requirement.

to disclose its unqualified right to change the terms of the Cardholder Agreement, but rather because Capital One has failed to show as a matter of law that it made its APR disclosure "in a reasonably understandable form and readily noticeable to the consumer." 12 C.F.R. pt. 226 supp. I, para. 5a(a)(2), cmt. 1. We therefore reverse the district court's dismissal of Rubio's TILA claim.

### III

Rubio alleges that Capital One's solicitation also violated the UCL, which prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (West 2008). A business act or practice may violate the UCL if it is either "unlawful," "unfair," or "fraudulent." Each of these three adjectives captures "a separate and distinct theory of liability." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (citing *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 316 (Ct. App. 1999)). According to Rubio, the solicitation she received violated the UCL under all of these theories of liability. Capital One responds that Rubio lacks standing to assert a UCL claim, and even if she had standing, her claim fails on its merits.

### A

**[10]** To assert a UCL claim, a private plaintiff needs to have "suffered injury in fact and . . . lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. This provision requires Rubio to show that she has lost "money or property" sufficient to constitute an "injury in fact" under Article III of the Constitution,[3] *see Birdsong v.*

---

[3]Standing under the UCL requires a particular kind of injury in fact — loss of "money or property." *See Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589, 625 n.31 (Ct. App. 2009). By contrast, Rubio has standing to bring her TILA claim simply because she "suffered the loss of a statutory right to disclosure." *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000).

*Apple, Inc.*, 590 F.3d 955, 959-60 (9th Cir. 2009), and also requires a "causal connection" between Capital One's alleged UCL violation and her injury in fact, *Hall v. Time Inc.*, 70 Cal. Rptr. 3d 466, 471-72 (Ct. App. 2008).

Rubio has alleged a loss of money or property. When Capital One increased the APR from 6.99% to 15.9%, it gave Rubio a choice either to close the account and pay off the outstanding balance, or to keep the account open and accept the increased APR. Rubio does not allege which choice she accepted, though either would cause a loss of money or property. If she closed the account, she would have suffered a monetary loss by losing the credit that Capital One extended. *White v. Trans Union, LLC*, 462 F. Supp. 2d 1079, 1084 (C.D. Cal. 2006) (ruling that damage to credit was loss of money or property). If she kept her account open, she would have accepted a higher APR and thus also lost money. *See Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589, 624-25 (Ct. App. 2009) (holding that payment of extra money as a result of the defendant's action was sufficient for standing). This "actual economic injury" is enough to create standing under the UCL. *Aron v. U-Haul Co. of Cal.*, 49 Cal. Rptr. 3d 555, 559 (Ct. App. 2006); *cf. Birdsong*, 590 F.3d at 961 (holding that hypothetical injury was insufficient for standing).

Rubio has also alleged a causal connection between Capital One's solicitation and the Hobson's choice she faced. Because Rubio alleges that she entered into a credit card agreement with Capital One due to the solicitation's promise of a "fixed" APR, the choice she faced in August 2007, when she learned of the APR increase, was "a result of" Capital One's alleged UCL violation.

B

Rubio has standing to assert her UCL claim. We now consider the merits of the claim under the "unlawful," "fraudulent," and "unfair" prongs of the UCL.

**[11]** By properly alleging a TILA violation, Rubio has also alleged a UCL violation under the prong of the UCL that prohibits "unlawful" business acts or practices. *See Velazquez v. GMAC Mortgage Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008); *Troyk*, 90 Cal. Rptr. 3d at 614.

**[12]** Rubio has also alleged a violation of the "fraudulent" prong of the UCL. As in TILA, this prong of the UCL is "governed by the reasonable consumer test": a plaintiff may demonstrate a violation by "show[ing] that [reasonable] members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citations and quotation marks omitted). This deception need not be intended. *See In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). As we have explained above, a reasonable consumer was indeed likely to be deceived by Capital One's solicitation.

**[13]** Finally, Rubio has stated a claim under UCL's "unfair" prong. California appellate courts disagree on how to define an "unfair" act or practice in the context of a UCL consumer action. *See generally Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007). Under the balancing test to which some courts adhere, Rubio may be able to prove facts showing that "the harm to the consumer" from Capital One's solicitation outweighed the solicitation's "utility." *Id.* at 735. She may, for example, be able to show that removing the term "fixed," an action that would have cost Capital One nothing, could have prevented consumer confusion. Under the alternative test, which requires a plaintiff to show that a practice violates public policy as declared by "specific constitutional, statutory or regulatory provisions," *Gregory v. Albertson's, Inc.*, 128 Cal. Rptr. 2d 389, 395 (Ct. App. 2002), Rubio has stated a claim by successfully alleging a TILA violation.

We therefore reverse the district court's dismissal of Rubio's UCL claim.

IV

The district court also dismissed Rubio's claim for breach of contract. She alleges that by stating that the credit card's APR was "fixed" at 6.99%, but later increasing the APR to 15.9%, Capital One breached its contract with her. Rubio's legal theory is that Capital One's solicitation was an offer and her application an acceptance.

[14] Rubio has not stated a breach-of-contract claim. Under California law, which according to Rubio controls, a binding offer "is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and *will conclude it*." *Donovan v. RRL Corp.*, 27 P.3d 702, 709 (Cal. 2001) (emphasis added, citation and quotation marks omitted). There is a binding offer only if it is reasonable to conclude, based on "all the surrounding circumstances," that acceptance will leave nothing further to negotiate or do before the contract is effective. *Id.*

[15] It would have been unreasonable to believe that Capital One's solicitation was a binding contractual offer. As the district court noted, the solicitation was generally described as an "invitation" or "application," and it listed a number of contingencies under which her application could be rejected. The solicitation did include a heading entitled "TERMS OF OFFER," but the language of that section made it clear that sending in the application, by itself, did not consummate the contract: "I hereby apply to Capital One Bank . . . for a credit card account. . . . I will receive the Capital One Customer Agreement and am bound by its terms and future revisions thereof." In *Lopez v. Charles Schwab & Co.*, the plaintiff had filled out an application form to open an account, which contained the similar statement, "I hereby request that [Schwab] open a brokerage account . . . . I agree to read and be bound by the terms of the applicable Account Agreement." 13 Cal. Rptr. 3d 544, 549 (Ct. App. 2004). The court of appeal con-

cluded that "[t]his language . . . indicates Lopez did not expect that filling out the application would conclude her bargain with Schwab . . . ." *Id.* The solicitation and application do not constitute an enforceable contract. The language in Capital One's solicitation is indistinguishable in all relevant aspects from the language in *Lopez* and did not constitute a binding offer.

Rubio also argues that the Cardholder Agreement was unconscionable. Under California law, however, unconscionability is an affirmative defense, *Dean Witter Reynolds, Inc. v. Superior Court*, 259 Cal. Rptr. 789, 794 (Ct. App. 1989), not a cause of action, *Cal. Grocers Ass'n v. Bank of Am.*, 27 Cal. Rptr. 2d 396, 403-04 (Ct. App. 1994). Rubio as plaintiff cannot assert unconscionability as an independent claim for relief. We affirm the district court's dismissal of Rubio's claim for breach of contract.

V

We affirm the district court's dismissal of Rubio's breach-of-contract claim but reverse its dismissal of her claims under TILA and the UCL. We remand for further proceedings consistent with this opinion. The parties shall bear their own costs.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

---

GRABER, Circuit Judge, concurring in part and dissenting in part:

I respectfully concur in part[1] and dissent in part.

---

[1]I agree with the majority that the solicitation did not constitute an offer. Plaintiff argues that California law governs the parties' agreement. But

The district court dismissed this case on the pleadings, reasoning that the required disclosure sufficed as a matter of law. The majority holds that the disclosure is inadequate as a matter of law. In my view, the clarity of the disclosure should be considered an issue of fact for the trier of fact. While a finder of fact could conclude, as the majority does, that the disclosure was unclear, for the reasons explained below I think that a finder of fact also could conclude that the disclosure was clear.

Defendant Capital One Bank told Plaintiff Raquel Rubio that she could apply for a credit card at "a fixed rate of 6.99%." Approximately three and a half years after Plaintiff obtained a Capital One credit card carrying the 6.99% rate, Defendant raised the annual percentage rate ("APR") to 15.9%. Defendant increased the APR because market interest rates had risen, rather than because of any irregularities in Plaintiff's payments or her use of the account. Was there a clear and conspicuous disclosure of the potential for raising the APR, for the purposes of the Truth In Lending Act ("TILA"), when the solicitation advertised "a fixed rate of 6.99%" but stated on *the same page* that the rates and fees were "subject to change"? In my view, there was.

---

even under California law, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and *will conclude it*." *Donovan v. RRL Corp.*, 27 P.3d 702, 709 (Cal. 2001) (emphasis added) (internal quotation marks omitted). Here, the solicitation made it clear that sending in the application did not, by itself, consummate the agreement. The solicitation listed a number of contingencies under which Plaintiff's application could be rejected. *See Lopez v. Charles Schwab & Co.*, 13 Cal. Rptr. 3d 544 (Ct. App. 2004) (holding that an application containing the statement, "I hereby request that [the defendant] open a brokerage account," did not create an enforceable contract).

In addition, because I too would hold that Plaintiff has stated a TILA claim—although I would decline to hold that the disclosure is clear as a matter of law—I agree with the majority that the district court erred by dismissing the California unfair competition claim.

In 2004, Defendant mailed Plaintiff a solicitation to open a credit card account. The solicitation began:

> YOU HAVE BEEN PRE-SELECTED FOR THIS OFFER FOR A CAPITAL ONE PLATINUM MASTERCARD FEATURING A LOW 6.99% FIXED APR ON BALANCE TRANSFERS AND PURCHASES, A CREDIT LINE UP TO $20,000* AND NO ANNUAL MEMBERSHIP FEE. *THIS IS NOT AN INTRODUCTORY RATE!*

The solicitation repeatedly referred to the 6.99% APR as "fixed." The "Schumer box," an informative table required by federal regulations, described the "**ANNUAL PERCENTAGE RATE** (APR) for purchases*" as "A fixed rate of **6.99%**." The asterisk directed the reader lower on the page, where the solicitation stated:

> *All your Annual Percentage Rates (APRs) are subject to increase if any of the following conditions ("Conditions") occur: (i) you fail to make a payment to us when due; (ii) your account is overlimit; (iii) or your payment is returned for any reason. All APRs will change with the beginning of the billing period after the period in which the condition occurred. The first time any of the Conditions occur, your purchase and special transfer APRs (if applicable) may be increased to a rate of 12.9% **ANNUAL PERCENTAGE RATE** (0.03534% daily periodic rate). If any of the Conditions occur twice within any 6-month period, all of your APRs may be increased to a rate of 25.9% **ANNUAL PERCENTAGE RATE** (0.07096% daily periodic rate).

Farther down on the same page, the "TERMS OF OFFER" included this provision: "I will receive the Capital One Customer Agreement and am bound by its terms and future revi-

sions thereof. My Agreement terms (for example, rates and fees) are subject to change."

Plaintiff responded to the credit card solicitation and, in March 2004, she received a cardholder agreement from Defendant. The agreement similarly provided that Defendant reserved the right to "amend or change any part of your Agreement, including periodic rates and other charges, or add or remove requirements . . . at any time." In August 2007, Defendant mailed Plaintiff a notification that the APR on her credit card was about to increase to 15.9% unless she halted her use of the card and made no further charges on it. The notice explained the change in the future lending rate as simply a response to changing market interest rates. "In light of rising interest rates over the past few years and the rate currently applied to your account balance, the APRs on your account are about to increase."

We have construed TILA and Regulation Z to prohibit disclosures that are either inconspicuous or opaque to a reasonable consumer. "Clear and conspicuous disclosures . . . are disclosures that a reasonable cardholder would notice *and understand*." *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) (emphasis added). Our inquiry is not whether additional disclosure would be useful to consumers but, rather, whether the disclosures that were made complied with the requirements of TILA and Regulation Z. *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1121 (9th Cir. 2009).

In other words, here, is the disclosure accurate and clear?[2] In my view, a reasonable trier of fact could find that it is.

---

[2]Plaintiff's brief does not argue that the disclosure is inconspicuous. In *Barrer*, we held that a disclosure was not conspicuous when "the change-in-terms provision appear[ed] . . . five dense pages after the disclosure of the APR" and was "neither referenced in nor clearly related to the 'Finance Terms' section." 566 F.3d at 892. Here, the APR disclosure and the general reservation of rights appear on the same page, in a legible font. A reasonable consumer would have noticed them; they are conspicuous.

The term "fixed" accurately describes an interest rate that is not linked to an external index and is not designed to expire or reset automatically at any particular point in time. The commentary to Regulation Z distinguishes between a "fixed-rate account" and a "variable-rate account." *See* 12 C.F.R. pt. 226 supp. I, para. 5a(b)(1), cmt. 5 (contrasting disclosures required for the different types of accounts). A "variable-rate account" is one in which "rate changes are part of the plan and are tied to an index or formula." *Id.* at cmt. 2. By implication, then, a fixed-rate account is one that does not share those characteristics. The account advertised by Defendant here did not feature rate changes tied to an index or formula as a part of the credit plan. That is, it was a fixed-rate account. The disclosure was accurate in describing the rate as "fixed."

Nor did Defendant's general reservation of rights—the provision stating that rates and fees were subject to change—transform the accurate term "fixed" into an inaccurate disclosure. 12 C.F.R. pt. 226, supp. I, para. 6(a)(2), cmt. 2. The account still did not involve *pre-planned* rate changes, even if Defendant retained the right to adjust the rate later in response to general market conditions.[3] The disclosure was accurate.

The crux of this dispute, then, is the *clarity* of the disclosure. Would a reasonable consumer understand that Defendant may alter the "fixed" APR because market conditions change? In my view, this should be a question of fact. Moreover, I conclude that a fact-finder reasonably could find that the answer to the question is "yes" because, on the same page as the statement of the 6.99% fixed rate, the solicitation

---

[3]The general reservation clause was permissible and need not have explained that Defendant might change the APR if market conditions changed. The commentary to Regulation Z anticipates that credit agreements may contain a general reservation clause. 12 C.F.R. pt. 226, supp. I, para. 6(a)(2), cmt. 2. And adequate disclosure under Regulation Z does not require that creditors must "specify the general circumstances under which they anticipate[ ] changing terms." *Barrer*, 566 F.3d at 891 n.9.

informed the consumer that "Agreement terms (for example, rates and fees) are subject to change." That is to say, a fact-finder permissibly could find that a reasonable consumer would understand from the disclosure here that the "fixed" APR might go up or down in the future.

An average consumer might well understand that a "fixed" rate on a credit card does not mean that the rate is "permanent" or "forever" when the issuer expressly and simultaneously reserves its right to "change" its "rates" later. Reasonable consumers know that interest rates fluctuate—sometimes dramatically—over time; no reasonable consumer expects that short-term borrowing rates will remain static forever. Reasonable consumers might well understand that, as market conditions change, the APR available from a credit card company *that has explicitly reserved its right to adjust rates prospectively* may change as well.[4]

Plaintiff contends that a reasonable consumer, even if aware that the fixed rate was not guaranteed permanently, would be confused by the solicitation's list of three conditions that would trigger a higher APR. Plaintiff argues that the customer reasonably might think that those three conditions are the *only* ones that permit a rate increase. A reasonable trier of fact could find this argument unpersuasive.

---

[4]Indeed, when Defendant formerly sought to entice customers to open an account with precisely that "forever" feature, it described the credit in very different terms. Fifteen years ago, Defendant advertised a card with a "Lifetime APR" and told consumers that they would "receive a low fixed APR of 10.9%—for life!" *DeMando v. Morris*, 206 F.3d 1300, 1301-02 (9th Cir. 2000) (emphasis omitted). The solicitation trumpeted: "You will keep this low fixed rate as long as your account remains in good standing. . . . [Y]ou will never have to shop for another credit card again!" *Id.* at 1302. By contrast, the solicitation at issue here lacks any reference to keeping the advertised interest rate "for life" or for the consumer's "lifetime," nor does it promise that the rate will stay the same "as long as" the account remains in good standing.

First, the statement that the APR is "subject to change if any of the following conditions ('Conditions') occur" notably lacks a qualifying term such as "only," "exclusively," or "solely." An average consumer might well understand the difference between saying that her rate will increase if she misses a payment and saying that her rate will increase *only* if she misses a payment.

But more importantly, a reasonable consumer would not necessarily believe that a "fixed APR" on a credit card whose issuer *has reserved its right to change rates* is a promise to keep the same interest rate forever so long as the cardholder behaves well. The warning that specific undesirable acts *by the cardholder* will lead to a higher interest rate does not necessarily suggest that the account will otherwise be shielded from *global economic conditions*.

What, then, should the result be when the majority's proposed understanding of the disclosure's clarity is not the only reasonable understanding? In my view, the better answer to that question is to remand the case for fact-finding.

There seems to be a circuit split regarding the question whether the clarity of a disclosure is a question of law or fact. The Seventh Circuit holds that this is a question of law. *Hamm v. Ameriquest Mortgage Co.*, 506 F.3d 525, 529 (7th Cir. 2007).[5] By contrast, the Third Circuit, in a case on which

---

[5]Although we have held that conspicuousness of a TILA disclosure is a question of law, *Am. Gen. Fin., Inc. v. Bassett (In re Bassett)*, 285 F.3d 882, 885 (9th Cir. 2002), we have not addressed how to treat the *clarity* of a disclosure. The reasons why we treat conspicuousness as a question of law do not compel us to treat clarity similarly. In *In re Bassett*, we borrowed the definition of conspicuousness from the Uniform Commercial Code ("UCC"). *Id.* at 884. The UCC expressly provides that conspicuousness is a decision for the court. U.C.C. § 1-201(b)(10). I am aware of no comparable UCC provision regarding clarity. We also explained in *In re Bassett* that "subjecting conspicuousness to fact-finding would introduce too much uncertainty into the drafting process." 285 F.3d at 885. Whether

the majority relies heavily in other respects, appears to treat the clarity of a disclosure as a question of fact.[6]

In *Roberts v. Fleet Bank (R.I.) National Ass'n*, 342 F.3d 260, 263 (3d Cir. 2003), a consumer received a solicitation advertising a "7.99% Fixed APR," which stated that the APR was "NOT an introductory rate" and that "[i]t won't go up in just a few short months." There, the issuer raised the cardholder's rate after 13 months. *Id.* at 264. As in this case, the *Roberts* solicitation listed two specific circumstances in which the fixed rate would increase—failure to meet payment requirements and closure of the account—and neither of those events had occurred. *Id.* at 263-64.

In *Roberts*, the Third Circuit "recognize[d] that a fixed rate is not necessarily permanent." *Id.* at 268 n.3. But it held that the solicitation *could* lead a reasonable consumer to be "confused about the temporal quality of the offer" and to conclude that rates "are subject to change only for the two reasons outlined." *Id.* at 268. As a result, the court held "that *a question of fact exists* as to whether Fleet made any misleading statements in the mailing" and whether it failed to disclose information clearly, as TILA requires. *Id.* at 269 (emphasis added).

The majority's reliance on evidence outside the pleadings

---

or not it is actually true that a court's determination regarding conspicuousness is more predictable than a fact-finder's, it is manifestly not true with respect to clarity. The assessment of a reasonable consumer's understanding of a disclosure would be more accurate—and hence more predictable—if made by an informed fact-finder than if made by a court in the abstract.

[6]In *Rossman v. Fleet Bank (R.I.) National Ass'n*, 280 F.3d 384, 394-95 (3d Cir. 2002), the Third Circuit implicitly treated the accuracy of a disclosure as a question of law. But the court did not discuss that issue, and it is not clear whether the court held that the disclosure was inaccurate because, in that record, no issue of fact existed or, instead, because the issue is always one of law.

underscores the appropriateness of fact-finding in a case such as this. The majority relies on the results of research done two years after Defendant sent the solicitation at issue here. The evidence on which the majority relies consists of an executive summary of three rounds of interviews with a total of 25 individuals who were shown mock credit card solicitations. *See* Macro Int'l Inc., Design and Testing of Effective Truth in Lending Disclosures, app. A, tbl. 1 (2007), *available at* http:// www.federalreserve.gov/dcca/regulationz/0523/summary.pdf [hereinafter Executive Summary] (showing that researchers interviewed nine consumers in Baltimore, nine in Kansas City, and seven in Denver). This small sample of consumers was not intended to be—and was not—representative of the card-holding public, even though the majority is correct that it was intended to represent the *range* of those consumers.[7] *Id.* at 17, app. A. The executive summary does not reveal how many of the consumers in two rounds of the interviews misinterpreted the term "fixed" as used in the experimental solicitations. *Compare id.* at 22 (stating that six participants in Kansas City misunderstood the term), *with id.* at 10, 30 (stating that "most participants" in Baltimore and in Denver misunderstood the term). Thus, the majority accepts what may be

_____

[7]A representative sample is one in which the frequency or distribution of some trait corresponds to that trait's frequency or distribution in the population being sampled. *See McGraw-Hill Dictionary of Scientific and Technical Terms* 1789 (6th ed. 2002) (defining "representative sample" as "[a] sample whose characteristics reflect those of the population from which it is drawn"). To illustrate the distinction, consider that a representative sample of college students would contain primarily individuals between 18 and 30 years of age, because most college students are young adults. By contrast, a sample that represented the *range* of college students might be made up of a precocious fourteen-year-old, a conventional nineteen-year-old, and an energetic senior citizen. Research on the former, representative sample would predict more accurately the behavior of college students because fourteen-year-olds and senior citizens are relatively uncommon among college students.

as few as 15 unrepresentative consumers as "persuasive." Maj. op. at 10395. I am dubious of that assessment.[8]

Furthermore, I am concerned by such heavy reliance on evidence that has bypassed the adversarial process. No party mentioned this research in briefing or at oral argument. Consequently, we are entirely ignorant of whether there are other flaws in the study that Defendant might bring to our attention if it had the opportunity to do so. Nor do we know if other research has yielded countervailing results.

Nothing in the former regulations suggested that the agency deemed the term "fixed" to be misleading. The researchers initially included it in their experimental solicitations, and none of the "key research questions" listed in the executive summary suggests that these experts suspected that the term would be misunderstood. Executive Summary at 2-3. In fact, even the researchers seem to have been surprised by their results regarding the term: they were slower to remove the term from subsequent rounds of interviews than they were to act on some of their other findings. The researchers continued to use the term "fixed" for three rounds of interviews, *id.* at iii, while they made several other changes to the experimental solicitations after the first and second rounds of interviews, *id.* at 14, 26-27.

In summary, a reasonable trier of fact could find that Defendant's solicitation accurately, conspicuously, and clearly disclosed the terms of its credit card account. What happens in an insurance bad-faith case (to take just one example) when the pleadings (or summary judgment documents)

---

[8]My discomfort is not assuaged by the fact that the Federal Reserve Board of Governors later cited this research to justify regulating use of the term "fixed." 74 Fed. Reg. 5244, 5272, 5372-73 (Jan. 29, 2009). The evidence that underlies a minor prospective change need not always be as persuasive as that required to hold a credit card company liable for its past actions.

allow a reasonable trier of fact to find *either* bad faith *or* good faith denial of coverage? The case proceeds to trial. The same is true for unfair trade practices, medical negligence, punitive damages, and nearly every other kind of claim—that is, whether or not the claim is statutory, and whether or not it involves assessing someone's state of mind.

In most areas of law, then, when reasonable minds can differ about a factual conclusion, an appellate court does not substitute itself for a finder of fact. I would apply the usual rule to the question of clarity of a TILA disclosure. I would, therefore, hold that the pleading is sufficient to state a claim but that issues of fact remain for resolution on remand.